**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**JENNIFER HAMEN, individually, and as**    )
**Personal Representative of the ESTATE**    )
**OF JOHN A. HAMEN III**    )
    **1613 Tattinger Trail**    )
    **Chesapeake, VA 23321**    )
        )
**REBEKKA HAMEN**    )
    **1613 Tattinger Trail**    )
    **Chesapeake, VA 23321**    )
        )
**J.H. a minor, by and through his parent**    )
**and natural guardian, JENNIFER HAMEN** )
    **1613 Tattinger Trail**    )
    **Chesapeake, VA 23321**    )
        )
**V.H. a minor, by and through her parent**    )
**and natural guardian, JENNIFER HAMEN** )
    **1613 Tattinger Trail**    )
    **Chesapeake, VA 23321**    )
        )
**A.H. a minor, by and through her parent**    )
**and natural guardian, JENNIFER HAMEN** )
    **1613 Tattinger Trail**    )
    **Chesapeake, VA 23321**    )
        )
**K.H. a minor, by and through her parent**    )
**and natural guardian, JENNIFER HAMEN** )
    **1613 Tattinger Trail**    )
    **Chesapeake, VA 23321**    )
        )
**S.H. a minor, by and through his parent**    )
**and natural guardian, JENNIFER HAMEN** )
    **1613 Tattinger Trail**    )
    **Chesapeake, VA 23321**    )
        )
**M.H. a minor, by and through his parent**    )
**and natural guardian, JENNIFER HAMEN** )
    **1613 Tattinger Trail**    )
    **Chesapeake, VA 23321**    )
        )
**MARK MCALISTER**    )
    **958 Moores Chapel Road**    )
    **Greenfield, TN 38230**    )

CRYSTAL MCALISTER                          )
    958 Moores Chapel Road               )
    Greenfield, TN 38230                )
                                        )
RAQUEL MCALISTER                           )
    114 Wooddale Drive                  )
    Greenfield, TN 38230                )
                                        )
CHRISTINA ANN MCALISTER                    )
    204 Evergreen Street                )
    Greenfield, TN 38230                )
                                        )
and                                        )
                                        )
CHRISTIAN MCALISTER                        )
    958 Moores Chapel Road              )
    Greenfield, TN 38230                )
                                        )
Plaintiffs,                                )
                                        )
v.                                         )       Case No. _____
                                        )
THE ISLAMIC REPUBLIC OF IRAN               )
Serve: Foreign Minister Mohammed Zarif     )       JURY DEMANDED
    Ministry of Foreign Affairs         )
    Khomeini Avenue                     )
    United Nations Street               )
    Tehran, Iran                        )
                                        )
and                                        )
                                        )
THE SYRIAN ARAB REPUBLIC                    )
Serve: Foreign Minister Walid al-Mualem    )
    Ministry of Foreign Affairs         )
    Shora, Muajireen, Damascus, Syria   )
                                        )
Defendants.                                )

## COMPLAINT

Plaintiffs, by counsel, bring this action seeking damages arising out of the October 20, 2015 hostage taking of John A. Hamen III ("John Hamen") and Mark McAlister ("Mark McAlister") at the hands of the Houthi Rebels ("Houthis") in Sana'a, Yemen, and John Hamen's

subsequent torture and extrajudicial killing. Plaintiffs move for judgment against Defendants the Islamic Republic of Iran ("Iran") and the Syrian Arab Republic ("Syria"), their Ministries, Agencies, and Instrumentalities, jointly and severally (collectively referred to herein as "Defendants"), for their respective roles as state sponsors of terrorism in providing material support to the Houthis, and in support thereof alleges as follows:

## JURISDICTION AND VENUE

1.      Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), and 1367.

2.      Despite their status as foreign states, Defendants are subject to suit in the courts of the United States pursuant to the Foreign Sovereign Immunities Act, as amended, specifically 28 U.S.C. § 1605A, due to their longstanding designations as "State Sponsors of Terrorism."

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4).

4.      John Hamen was domiciled in the Commonwealth of Virginia at the time of his hostage taking, torture, and extrajudicial killing.

5.      Mark McAlister was domiciled in the State of Tennessee at the time of his hostage taking.

6.      John Hamen and Mark McAlister were nationals of the United States performing a contract awarded by the United States Government, acting within the scope of their employment, at the time of their hostage taking.

## THE PARTIES

7.      Plaintiffs, the immediate family of John Hamen, Mark McAlister, and the immediate family of Mark McAlister (collectively referred to herein as "Plaintiffs"), are all

United States citizens. The Hamen family members are all residents of the Commonwealth of Virginia. The McAlister family members are all residents of the State of Tennessee.

8.      Plaintiff Jennifer Hamen is the widow of John Hamen. She is qualified as the personal representative of the Estate of John Hamen on behalf of her deceased husband. Plaintiffs Rebekka Hamen, J.H., V.H., A.H., K.H., S.H., and M.H. are the natural born children of John and Jennifer Hamen.

9.      Plaintiff Crystal McAlister is the spouse of Mark McAlister. Plaintiffs Raquel McAlister, Christina Ann McAlister, and Christian McAlister are the natural born children of Mark and Crystal McAlister.

10.     Defendant, Iran, is a foreign state. Since January 19, 1984, Iran has been designated as a state sponsor of international terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).

11.     Defendant, Syria, is a foreign state. Since December 29, 1979, Syria has been designated as a state sponsor of international terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).

## FACTUAL ALLEGATIONS

a.      **Background on Conflict in Yemen**

12.     The Houthis are a modern wing of a rebel group known as *Ansar Allah* ("Partisans of God") that adheres to a branch of Shia Islam known as Zaidism.

13.     In 2004, a Zaidi leader and founder of the Houthis, Hussein al-Houthi, was killed by the Yemeni government. His death sparked renewed fervor amongst his followers and swelled the military ranks of the Houthis in support of their rebellion.

14.     The Houthis official slogan is "God is great, Death to America, Death to Israel, God curse the Jews, Victory to Islam."

15.     In 2011, in the midst of the Arab Spring movement, Yemeni President Ali Abdullah Saleh ("Saleh") was driven out of power. In an internationally brokered transition, Saleh was replaced by Abdu Rabbu Mansur Hadi ("Hadi"). The Hadi government was supported by Yemen's neighbor Saudi Arabia and by the United States of America.

16.     On November 27, 2013, the United Nations Security Council issued a public statement praising the Hadi government's "progress made to date in Yemen's ongoing political transition process" and its "efforts to reconstruct the economy and safeguard security."

17.     On August 29, 2014, the United Nations Security Council condemned the Houthis for obstructing political transactions in Yemen. Two days later, the Houthis announced their intention to escalate their campaign to bring down the Hadi government.

18.     President Barack Obama hailed the installation and support of the Hadi government as a successful step in America's foreign policy efforts "to degrade and ultimately destroy the terrorist group known as ISIL."

19.     In September 2014, the Houthis forcefully entered Yemen's capital city of Sana'a as unrest became more prevalent throughout the country.

20.     By October 2014, the United Nations and the Hadi government had instituted multiple strategic partnerships aimed at strengthening civil service, supporting food security,

improving agriculture, addressing climate change, and encouraging the voluntary return of refugees.

21.     In a November 1, 2014 letter submitted to the United Nations, the United States requested sanctions against Saleh and two Houthi military leaders based upon "attempts to cause chaos throughout Yemen" by using the Houthis to "not only delegitimize the central government, but also create enough instability to stage a coup." This letter reported that Saleh had sought assistance from al-Qaeda to carry out assassinations to weaken the Hadi government.

22.     By January 2015, the Houthis had succeeded in completely overthrowing the Hadi government and had placed Hadi under house arrest.

23.     In February 2015, Hadi fled to the port city of Aden, the former capital of South Yemen, and began to amass regional support for a civil war against the Houthis. Most notably, Hadi successfully obtained the military support of Saudi Arabia.

24.     On September 26, 2015, the Yemeni Coalition to Monitor Human Rights Violations issued a report alleging human rights abuses carried out by the Houthis between September 21, 2014 and August 15, 2015, including but not limited to:

a.   At least three soldiers being killed after their arrest but while inside public hospitals, and reports of others being abducted immediately upon their release;

b.   The random shelling of residential areas within cities;

c.   Over three thousand civilian deaths and more than seven thousand wounded, including over eight hundred women and children;

d.   Over five thousand cases of arbitrary detention, with suspicion of using these prisoners as human shields at military sites that may be targeted by airstrikes;

6

e.   Nearly one thousand cases of forced disappearance;

f.   At least two hundred fifteen abductions or forced disappearances of children and two involving individuals with special needs;

g.   The death of eleven detainees as a result of using them as human shields during airstrikes; and

h.   Three documented cases of death resulting from torture;

b.   **Iran's Material Support of the Houthis**

25.   Due to a long history of providing financial and military support to terrorists, Iran is officially designated as a state sponsor of international terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).

26.   In accordance with its explicit foreign policy goals, Iran regularly supports, enables, and assists other foreign states, organizations, terrorist groups, and rebel forces in destabilizing governments that are friendly to the United States, Israel, and/or Saudi Arabia.

27.   In support of that goal, Iran provided material support and resources to the Houthis in an attempt to enable and assist the Houthis' efforts to overthrow the internationally recognized government of Yemen.

28.   The founder of the Houthis movement, Hussein al-Houthi, established the Houthis ongoing relationship with Iran by traveling to Tehran as early as 1986.

29.   A confidential 2015 United Nations' report found that "[c]urrent military Iranian support to Houthis in Yemen is consistent with patterns of arms transfers going back to more than five years to date." A number of paragraphs in that report highlight specific events

composing that pattern of activity, but these are clearly only the tip of the iceberg as successful arms transfers have, by definition, gone undetected.

30.     Since at least 2009, the Iranian Martyrs Foundation, a fund overseen by Iran, has provided significant financial support to the Yemen Martyrs Foundation, a Houthi organization.

31.     In April 2009, the crew of an unnamed Iranian vessel loaded crates of weapons onto Yemeni boats in international waters for use by the Houthis.

32.     In October 2009, Yemen seized an Iranian ship loaded with anti-tank weapons in the Red Sea. Six crew members on board were identified as weapons experts sent to replace other Iranian weapons experts that had been injured while fighting alongside the Houthis.

33.     In February 2011, an Iranian fishing vessel was seized by Yemeni authorities while carrying 900 Iranian-made anti-tank and anti-helicopter rockets intended for the Houthis.

34.     In 2013, Yemeni authorities seized an Iranian ship, the "Jihan," in the act of carrying military-grade weapons to the Houthis.

35.     On March 10, 2014, Israeli forces seized an Iranian vessel off the Eritrean coast carrying arms intended for the Houthis. Iran has utilized Eritrean islands in the Red Sea to provide military training to Houthi soldiers and to store weapons for later use by the Houthis.

36.     In September 2014, a representative within the Iranian parliament stated that "[t]hree Arab capitals have today ended up in the hands of Iran" and concluded that Sana'a, Yemen, was in the process of becoming the fourth to join "the Islamic Iranian revolution" that is a key part of the "grand jihad." He further stated that success in Yemen will allow Iranian influence to "extend, following [the Houthis'] success, into Saudi territories. The Yemeni-Saudi vast borders will help accelerate [Iran's] reach into the depths of Saudi land."

37.     In January 2015, a representative of Iran's Supreme Leader Ali Khamenei referred to the Houthis as "a similar copy to Lebanon's Hezbollah" and stated that Iran "directly supports the Houthis in Yemen, Hezbollah in Lebanon, the popular forces in Syria and Iraq." He also confirmed that Iranian officials "have reiterated this many times."

38.     In an April 8, 2015 interview, United States Secretary of State John Kerry confirmed that Iran was providing material support to the Houthis. "[T]here are obviously supplies that have been coming from Iran. There are a number of flights every single week that have been flying in. And we trace those flights, and we know this. We are well aware of the support that Iran has been giving to Yemen."

39.     On September 26, 2015, less than a month before John Hamen and Mark McAlister were wrongfully detained, the United States Navy confiscated weapons and military equipment from an Iranian fishing boat off the coast of Oman that was reported to be destined for delivery to the Houthis.

40.     Iran has regularly brought groups of one hundred Houthi soldiers into military camps in southern Syria to gain combat and weapon experience. This program has trained as many as three thousand Houthis with the goal of making them more effective fighters in the war against the Hadi government.

41.     The military training, military intelligence, and economic support provided to the Houthis by Iran was a direct and proximate cause of the military success of the Houthis, their successful overthrow of the internationally recognized Hadi government, and the Houthis' overtaking of Sana'a prior to John Hamen and Mark McAlister's arrival in October 2015.

42.     As a recognized State Sponsor of Terrorism, Iran can be held responsible before this Court for the provision of material support leading to the Houthis' hostage taking of John Hamen and Mark McAlister and torture and extrajudicial killing of John Hamen.

43.     Iranian support for the Houthis continues to the present day, evidenced by the interception of three ships carrying military equipment from Iran to the Houthis between February 27, 2016 and March 28, 2016. The ships attempted to conceal their true identity and purpose by sailing under the flag of the Marshall Islands and claiming to carry medical supplies. On these three vessels alone, Iran was caught smuggling 5,500 AK-47 assault rifles, 400 rocket-propelled grenade launchers, and dozens of .50 caliber machine guns, Dragunov sniper rifles, 60mm mortar tubes, anti-tank missiles, and other associated military equipment to the Houthis.

c.     **Syria's Material Support of the Houthis**

44.     Due to a long history of providing financial and military support to terrorists, Syria is officially designated as a state sponsor of international terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).

45.     In accordance with its explicit foreign policy goals, Syria regularly supports, enables, and assists other foreign states, organizations, terrorist groups, and rebel forces in destabilizing governments that are friendly to the United States, Israel, and/or Saudi Arabia.

46.     In support of that goal, Syria provided material support and resources to the Houthis in an attempt to enable and assist the Houthis' efforts to overthrow the recognized Hadi government.

47.     Since at least 2013, Houthi soldiers have freely traveled to and through Syria, with the assistance of Iran, in order to receive military training. In exchange, Houthi soldiers

would fight on behalf of the Iranian-backed Syrian government. In May of 2013, two-hundred Houthi fighters were reported to be fighting on behalf of Syria.

48.     In early 2015, representatives from the Syrian National Defense Army visited Yemen to provide military training to the Houthis and to facilitate the exchange of military intelligence between the two sides.

49.     The military training, military intelligence, and economic support provided to the Houthis by Syria was a direct and proximate cause of the success of the Houthis, their successful overthrow of the internationally recognized Hadi government, and the Houthis' overtaking of Sana'a prior to John Hamen and Mark McAlister's arrival in October 2015.

50.     As a recognized State Sponsor of Terrorism, Syria can be held responsible before this Court for the provision of material support leading to the Houthis' hostage taking of John Hamen and Mark McAlister and torture and extrajudicial killing of John Hamen.

d.     **John Hamen & Mark McAlister in Yemen**

51.     Advanced C4 Solutions ("AC4S") is a private military contractor headquartered in Tampa, Florida.

52.     AC4S is a private contractor working on United States Department of State contract SAQMMA13D0021 in Sana'a, Yemen, for the "maintenance and operation of diplomatic transit facility."

53.     As a result of the ongoing military conflict, the Sheraton Hotel adjacent to the United States Embassy complex in Sana'a was voluntarily handed over to the United States government for use as an extension of the Embassy, primarily for use as secure lodging for employees and guests of the Embassy.

54.     Upon information and belief, one of AC4S's tasks under contract SAQMMA13D0021 in Sana'a was to retrofit and improve building security, technological security, and communications systems at the former Sheraton Hotel.

55.     On or about February 11, 2015, the United States suspended its embassy operations in Sana'a and evacuated its diplomatic personnel.

56.     Upon information and belief, sometime shortly thereafter, United Nations personnel were authorized to use the embassy complex as a temporary base of operations because it was not being actively used by the United States.

57.     AC4S continued its operations under contract SAQMMA13D0021 despite the fact that United States diplomatic personnel had evacuated Sana'a in February.

58.     John Hamen had retired from the United States Army via honorable discharge on January 27, 2012. He then sought employment with private military contractors, leveraging the skills and experience he had gained as a longtime member of the military. Mark McAlister worked for private paramilitary contractors prior to AC4S in the Middle East.

59.     On July 23, 2015, AC4S offered John Hamen full-time employment as a "Security Risk Manager" with an initial base annual salary of $70,000 and an estimated average annual pay of $160,461.54. His official "work location" was Sana'a, Yemen.

60.     John Hamen and Mark McAlister were hired by AC4S to work exclusively on duties related to United States State Department contract SAQMMA13D0021.

61.     On October 13, 2015, John Hamen and Mark McAlister traveled to Djibouti as a means of obtaining entrance into Yemen.

62.     Upon information and belief, John Hamen and Mark McAlister were being deployed at the direction of both the State Department and AC4S and counted on the State Department and AC4S to appropriately monitor events on the ground in Sana'a.

63.     John Hamen and Mark McAlister remained in Djibouti from October 13 until October 20, 2015. During this time, both men kept in daily contact with their families.

64.     On October 20, 2015, John Hamen and Mark McAlister, at the direction of AC4S and the State Department, flew from Djibouti to Sana'a, Yemen, aboard a United Nations flight.

65.     Before leaving the Sana'a airport, John Hamen and Mark McAlister were detained by the Houthis and accused of being spies. Without the opportunity to contact their families, employer, government, or an attorney, they were taken to a nearby prison facility and interrogated.

66.     Upon information and belief, the Houthis' true purpose for detaining John Hamen and Mark McAlister was to compel Saudi Arabia, due to pressure from the United States seeking the release of its citizens, to abstain from further bombing of Yemen, and/or to use John Hamen and Mark McAlister as negotiating leverage to obtain the release of combatants and/or for other reasons unrelated to any charges against the two men.

67.     John Hamen did not communicate with his family again after he left Djibouti on October 20, 2015.

68.     Mark McAlister did not speak with his wife again until March 10, 2016.

e.     **The Hostage Taking of Mark McAlister**

69.     Mark McAlister was separated from John Hamen within the first several hours of his confinement and interrogation.

70.     Mark McAlister was detained by the Houthis under inhumane conditions, incommunicado, without access to a consular officer, or a lawyer, and without the right to challenge the lawfulness of his detention, in violation of international norms and laws such as, but not limited to, the Vienna Convention on Consular Relations, the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, and the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (collectively, "International Law").

71.     Among other things, Mark McAlister was put in solitary confinement in a small 12-foot by 9 ½-foot concrete cell for the first twenty days of his unlawful detention, with no contact with other humans except for his interrogators, who questioned him for hours each night. There was no light in his cell, no bed other than a two-inch mattress on a concrete floor, and a hole in the floor that served as a toilet. During his entire six months and twelve days of confinement, Mark McAlister was forced to wear the same set of clothes, use the bathroom without any toilet paper, and subsist on a bare minimum amount of water and food.

72.     During his confinement, Mark McAlister lost so much weight that his ribs and backbone were clearly visible and he was emaciated. Moreover, he was not given medical treatment when he became sick and when he suffered from a chronic back injury.

73.     During the six months and twelve days of his confinement, he was allowed to go out to the prison yard a total of three times, the only times that he saw the sun.

74.     He was repeatedly interrogated, threatened, intimidated and psychologically and physically abused, deprived, and manipulated.

75.     Mark McAlister was released into United States government custody on April 29, 2016.

76.     Under Article 1 of the International Convention Against the Taking of Hostages, as referenced in 28 U.S.C. § 1605A, Mark McAlister was taken hostage by the Houthis over a period of 192 days from October 20, 2015, until April 29, 2016.

f.      **The Hostage Taking, Torture, and Extrajudicial Killing of John Hamen**

77.     All efforts by the United Nations, AC4S, and the United States government to secure John Hamen's release through hostage negotiations were fruitless.

78.     Upon information and belief, John Hamen was detained by the Houthis under inhumane conditions, incommunicado, without access to a consular officer or a lawyer, and without the right to challenge the lawfulness of his detention, in violation of International Law.

79.     Upon information and belief, John Hamen was tortured by the Houthis in violation of International Law.

80.     Upon information and belief, John Hamen was killed by the Houthis on November 6, 2015, in violation of International Law.

81.     On November 6, 2015, a body was delivered to a local hospital by the Houthis and transported to the closest available United States Embassy in Oman. This body was identified as that of John Hamen on the basis of tattoos.

82.     Shortly thereafter, Jennifer Hamen was informed by individuals in the State Department that the Houthis "found him dead in his room."

83.     An autopsy was performed at Dover Air Force Base on November 10, 2015. The official cause of death was listed as "Asphyxia," and the manner of death was listed as "Homicide."

84.     The autopsy reached these conclusions due to the discovery of a "[n]ear complete circumferential ligature mark around the neck," sizeable "lacerations of the forehead and back of

the head," "[f]ractures of the 6th-9th right ribs," and the existence of many "abrasions and contusions."

85.     Under Article 1 of the International Convention Against the Taking of Hostages, as referenced in 28 U.S.C. § 1605A, John Hamen was taken hostage by the Houthis over a period of eighteen days from October 20, 2015, until November 6, 2015.

86.     Under Section 3 of the Torture Victim Protection Act of 1991, as referenced in 28 U.S.C. § 1605A, John Hamen was tortured by the Houthis over a period of eighteen days from October 20, 2015, until November 6, 2015.

87.     Under Section 3 of the Torture Victim Protection Act of 1991, as referenced in 28 U.S.C. § 1605A, the Houthis committed an extrajudicial killing when, on November 6, 2015, without due process of law, they killed John Hamen by means of asphyxiation.

88.     The McAlister family suffered extreme grief and mental anguish due to the hostage taking of their husband and father.

89.     The Hamen family suffered extreme grief and mental anguish due to the loss of their husband and father, further aggravated by the violent and sudden manner of his death.

## COUNT I – THE PROVISION OF MATERIAL SUPPORT FOR THE HOSTAGE TAKING OF MARK MCALISTER
### (28 U.S.C. § 1605A(c))

90.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

91.     Iran has provided material support to the Houthis for the purpose of supporting, enabling, advancing, and benefiting from the Houthis' successful military campaign against the internationally recognized Hadi government.

92.     Syria has provided material support to the Houthis for the purpose of supporting, enabling, advancing, and benefiting from the Houthis' successful military campaign against the internationally recognized Hadi government.

93.     Iran and Syria support the Houthis' military activities with the intention of weakening American allies in the Middle East, including the internationally recognized Hadi government and its close ally Saudi Arabia.

94.     As such, Defendants' provision of material military and economic support to the Houthis is intentional, wanton, and willful, with the understanding that violence against Americans such as Mark McAlister is an expected and welcomed result of such support.

95.     As a direct and proximate result of Defendants' willful, wrongful, and intentional acts, Mark McAlister was taken hostage by the Houthis.

96.     As a direct and proximate result of Defendants' actions, Mark McAlister endured severe pain and suffering.

97.     As a direct and proximate result of Defendants' actions, Crystal McAlister has experienced significant solatium damages including, but not limited to, severe mental anguish and the harm caused by the loss of Mark McAlister's society and comfort.

98.     As a direct and proximate result of Defendants' actions, the three natural children of Mark McAlister have experienced significant solatium damages including, but not limited to, severe mental anguish and the harm caused by the loss of Mark McAlister's society and comfort.

99.     Defendants' continuing provision of material support to those willing to commit hostage taking, torture, and extrajudicial killings is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

100.    Such conduct violates 28 U.S.C. § 1605A.

101.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

## COUNT II –  THE PROVISION OF MATERIAL SUPPORT FOR THE HOSTAGE TAKING, TORTURE, AND EXTRAJUDICIAL KILLING OF JOHN HAMEN (28 U.S.C. § 1605A(c))

102.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

103.    Iran has provided material support to the Houthis for the purpose of supporting, enabling, advancing, and benefiting from the Houthis' successful military campaign against the internationally recognized Hadi government.

104.    Syria has provided material support to the Houthis for the purpose of supporting, enabling, advancing, and benefiting from the Houthis' successful military campaign against the internationally recognized Hadi government.

105.    Iran and Syria support the Houthis' military activities with the intention of weakening American allies in the Middle East, including the internationally recognized government of Yemen and its close ally Saudi Arabia.

106.    As such, Defendants' provision of material military and economic support to the Houthis is intentional, wanton, and willful, with the understanding that violence against Americans such as John Hamen is an expected and welcomed result of such support.

107.    As a direct and proximate result of Defendants' willful, wrongful, and intentional acts, John Hamen was taken hostage, tortured, and extrajudicially killed by the Houthis.

108.    As a direct and proximate result of Defendants' actions, John Hamen endured severe pain and suffering, eventually resulting in his death.

109.     As a direct and proximate result of Defendants' actions, John Hamen suffered, and the Hamen family will continue to suffer, significant economic damages.

110.     As a direct and proximate result of Defendants' actions, Jennifer Hamen has experienced, and will likely continue to experience, significant solatium damages including, but not limited to, severe mental anguish, bereavement and grief, as well as the harm caused by the loss of John Hamen's society and comfort.

111.     As a direct and proximate result of Defendants' actions, the seven natural children of John Hamen have experienced, and will likely continue to experience, significant solatium damages including, but not limited to, severe mental anguish, bereavement and grief, as well as the harm caused by the loss of John Hamen's society and comfort.

112.     Defendants' continuing provision of material support to those willing to commit hostage taking, torture, and extrajudicial killings is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

113.     Such conduct violates 28 U.S.C. § 1605A.

114.     A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

## COUNT III – WRONGFUL DEATH OF JOHN HAMEN
### (Va. Code Ann. § 8.01-50)

115.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

116.     Defendants' actions constituted negligence, carelessness, gross negligence, recklessness, intentional and/or malicious conduct.

117. Defendants were and are directly responsible for the death of John Hamen through these wrongful, negligent, reckless, and/or intentional acts and failures to act.

118. John Hamen's death was directly and proximately caused by the wrongful, negligent, reckless and/or intentional acts of Defendants and/or their failures to act.

119. John Hamen is survived by Jennifer Hamen, his wife, and by seven children, Rebekka Hamen, J.H., V.H., A.H., K.H., S.H., and M.H., who together are his statutory beneficiaries pursuant to Va. Code Ann. § 8.01-53.

120. As a result of the death of John Hamen, his statutory beneficiaries have suffered severe and substantial damages, including, but not limited to, the following:

    a. Grief, sorrow, mental anguish, and solace, including loss of society, companionship, comfort, guidance, and advice;

    b. Loss of income, care, and assistance provided by John Hamen; and

    c. Funeral expenses.

121. In addition to compensatory damages under Va. Code Ann. § 8.01-52, Plaintiffs seek punitive damages for Defendants' willful and wanton conduct and/or recklessness, which evinced a conscious disregard for the safety of John Hamen and caused his death.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court grant judgment against Defendants, jointly and severally, on Counts I, II, and III, and grant all Plaintiffs, individually, and Jennifer Hamen as Personal Representative of the Estate of John Hamen:

For Count I, a total sum of $319,670,000, allocated accordingly:

    a. Damages for confinement of and attendant loss of liberty for Mark McAlister for a one hundred ninety-two (192) day period in the amount of $1,920,000.

b. Damages for post-release pain and suffering experienced by Mark McAlister in the amount of $5,000,000.

c. Solatium damages in a total amount of $12,750,000, comprised of the following sums:

- $6,000,000 on behalf of Crystal McAlister, wife of Mark McAlister;

- $2,250,000 on behalf of Raquel McAlister, daughter of Mark McAlister;

- $2,250,000 on behalf of Christina Ann McAlister, daughter of Mark McAlister;

- $2,250,000 on behalf of Christian McAlister, son of Mark McAlister;

d. Punitive damages in the amount of $300,000,000;

e. Reasonable court costs and related expenses;

f. Reasonable attorneys' fees; and

g. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Count II, a total sum of $356,680,000, allocated accordingly:

a. Damages for confinement of and attendant loss of liberty for John Hamen for an eighteen (18) day period in the amount of $180,000;

b. Damages for pain and suffering, including torture, experienced by John Hamen prior to his death in the amount of $10,000,000;

c. Economic damages in the amount of $3,000,000, or an otherwise appropriate sum to be proven at trial;

    d.   Solatium damages in a total amount of $43,500,000, comprised of the

        following sums:

            -  $12,000,000 on behalf of Jennifer Hamen, wife of John Hamen;

            -  $4,500,000 on behalf of Rebekka Hamen, daughter of John Hamen;

            -  $4,500,000 on behalf of J.H., son of John Hamen;

            -  $4,500,000 on behalf of V.H., daughter of John Hamen;

            -  $4,500,000 on behalf of A.H., son of John Hamen;

            -  $4,500,000 on behalf of K.H., daughter of John Hamen;

            -  $4,500,000 on behalf of S.H., daughter of John Hamen; and

            -  $4,500,000 on behalf of M.H., son of John Hamen;

    e.   Punitive damages in the amount of $300,000,000;

    f.   Reasonable court costs and related expenses;

    g.   Reasonable attorneys' fees; and

    h.   Such other and further relief as the Court may determine to be just and

        equitable under the circumstances.

For Count III, a total sum of $57,063,019.70, allocated accordingly:

    a.   Damages for grief, sorrow, mental anguish, and solace, including loss of

        society, companionship, comfort, guidance, and advice in the amount of

        $53,680,000;

    b.   Loss of income, care and assistance provided by John Hamen in the amount of

        $3,000,000;

    c.   Funeral expenses in the amount of $8,019.70; and

    d.   Punitive damages in the amount of $350,000.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.


Dated: July 1, 2016                                 Respectfully submitted,

                                       /s/ Andrew J. Hull
                                       Karla L. Palmer (D.C. Bar No. 444353)
                                       Andrew J. Hull (D.C. Bar No. 1022649)
                                       Hyman, Phelps & McNamara, P.C.
                                       700 13th Street, N.W., Suite 1200
                                       Washington, D.C. 20005
                                       Phone: (202) 737-5600
                                       Fax: (202) 737-9329
                                       Email: kpalmer@hpm.com
                                       Email: ahull@hpm.com