## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JENNIFER HAMEN et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:16cv01394** |
| | ) | |
| **THE ISLAMIC REPUBLIC OF IRAN et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

COMES NOW, Plaintiffs, by counsel, and submits the following proposed findings of fact and conclusions of law to the Court:

**I.    PROPOSED FINDINGS OF FACT**

**A.    The Parties**

1.    Plaintiff Jennifer Hamen is the widow of John A. Hamen, III ("John Hamen"), the legal representative of the Estate of John Hamen, the legal guardian of V.H., A.H., K.H., S.H., and M.H., and an American citizen. ECF No. 49 at 193–94 (Test. Jennifer Hamen).

2.    Plaintiff Rebekka Hamen is the daughter of John Hamen and an American citizen. *See* ECF No. 49 at 193–94 (Test. Jennifer Hamen); *see also* ECF No. 45-2 at ¶¶ 2–3.

3.    Plaintiff Johann Hamen is the son of John Hamen and an American citizen. *See* ECF No. 49 at 167–68 (Test. Johann Hamen); *see also* ECF No. 45-11 at ¶¶ 2–3.

4.    Plaintiffs V.H., A.H., K.H., S.H., and M.H. are the minor children of John Hamen and are all American citizens. *See* ECF No. 49 at 193–94 (Test. Jennifer Hamen); *see also* ECF No. 45-2 at ¶¶ 2–3.

5.    Plaintiff Mark McAlister is an American citizen. ECF No. 48 at 43 (Test. Mark McAlister).

6.      Plaintiff Crystal McAlister is the wife of Mark McAlister and an American citizen. ECF No. 48 at 42–43 (Test. Mark McAlister); *see also* ECF No. 49 at 131–32 (Test. Crystal McAlister).

7.      Plaintiff N. Raquel McAlister is the daughter of Mark McAlister and an American citizen. ECF No. 48 at 42–43 (Test. Mark McAlister); *see also* ECF No. 49 at 131–32 (Test. Crystal McAlister).

8.      Plaintiff Christina McAlister is the daughter of Mark McAlister and an American citizen. ECF No. 48 at 42–43 (Test. Mark McAlister); *see also* ECF No. 49 at 131–32 (Test. Crystal McAlister).

9.      Plaintiff Christian McAlister is the son of Mark McAlister and an American citizen. ECF No. 48 at 42–43 (Test. Mark McAlister); *see also* ECF No. 49 at 131–32 (Test. Crystal McAlister).

10.      Defendant, the Islamic Republic of Iran ("Iran") is a foreign state.

**B.      Background on the Houthis**

11.      Ansar Allah ("the Houthis") are followers of the Zaydi Shia sect of Islam and historically lived in the northern area of Yemen known as Saada. ECF No. 44-3 at ¶ 20; *see also* ECF No. 49 at 43–44 (Test. Dr. Daniel Green).

12.      Economic, political, and religious tensions have caused conflict between the Houthis and the Yemeni government for years. ECF No. 44-3 at ¶¶ 19–28; *see also* ECF No. 49 at 43–44, 46 (Test. Dr. Daniel Green).

13.      In 2011, in the midst of the Arab Spring movement, the Yemeni government led by President Saleh, was unable to provide even basic services to its citizens and fell apart. The international community stepped in and brokered a transitional regime that took control under

interim President Abdrabbuh Mansur Hadi. *See* ECF No. 49 at 49–50 (Test. Dr. Daniel Green); *see also* ECF No. 46-1 at 17–20 (Dep. Test. Dr. Al-Junaid).

14.     Between 2013 and 2014, the United Nations praised the transitional government's leadership, citing the fair election of President Hadi, economic progress, improvements in agriculture, and a return of refugees. *See* ECF No. 49 at 50–51 (Test Dr. Daniel Green).

15.     This transitional government included representation for the Houthis, but they were dissatisfied with the level of that representation and certain policies and accordingly began to foment unrest. ECF No. 44-3 at ¶¶ 31, 36; *see also* ECF No. 46-1 at 20–23 (Dep. Test. Dr. Al-Junaid).

16.     In September 2014, the Houthis, allied with forces loyal to former President Saleh, and with material support and resources from Iran, seized control of the capital city of Sana'a and within a few short months had formally overthrown the transitional government. ECF No. 44-3 at ¶ 36; *see also* ECF No. 49 at 53–54 (Test Dr. Daniel Green).

17.     During the ensuing months, according to a United States Department of State ("State Department") report, the Houthis engaged in human rights abuses including the use of excessive force, torture, poor prison conditions, arbitrary arrests, hostage taking, and the infringement of basic human rights. *See* ECF No. 49 at 101–04 (Test Dr. Daniel Green); *see also* Hr'g Ex. 39 at 1–2.

18.     Between September 2014 and August 2015, the Houthis arbitrarily detained 5,894 individuals, forcibly adducted 982 persons for which they extracted pledges and demanded ransom, and engaged in 796 documented cases of torture. *See* ECF No. 49 at 101 (Test Dr. Daniel Green); *see also* Hr'g Ex. 39 at 4–5, 16.

### C.    The Capture of Mark McAlister and John Hamen

19.     Mark McAlister and John Hamen were employees of AC4S, a company with a government contract to complete work on a building owned by the State Department in Sana'a, Yemen. *See* ECF No. 48 at 48–50, 55–56 (Test. Mark McAlister).

20.     As of October 2015, that building was in use by the United Nations. ECF No. 48 at 148–149 (Test. Sealed Witnesses).

21.     On October 20, 2015, John Hamen and Mark McAlister boarded a flight chartered by the United Nations from Djibouti to Sana'a, Yemen. ECF No. 48 at 58 (Test. Mark McAlister).

22.     A Houthi guard detained the Americans at the airport for several hours, searched their bags, and made multiple telephone calls. *See* ECF No. 48 at 60–63 (Test. Mark McAlister).

23.     When additional armed guards arrived at the airport, they bound the hands of Mr. McAlister and Mr. Hamen, blindfolded them, and loaded them into a van. The inside of the van was lined with woven wire to deter escape. *See* ECF No. 48 at 61, 64–65 (Test. Mark McAlister).

24.     The captives were taken to a prison facility where they were stripped of their belongings, interrogated, and eventually separated. *See* ECF No. 48 at 66–70 (Test. Mark McAlister).

25.     Another American contractor, who was also in Sana'a when Mark and John were taken hostage, was taken to the airport and allowed to leave Yemen only after the payment by an intermediary of tens of thousands of dollars to a Houthi representative. ECF No. 48 at 158–160 (Test. Sealed Witnesses).

26.     The Houthi guards who detained Mark and John bragged to the other prisoners that they would get "something in exchange, as they had done before." *See* ECF No. 46-1 at 41–42, 44 (Dep. Test. Dr. Al-Junaid).

**D.     The Death of John Hamen**

27.     Between October 20, 2015 and November 6, 2015, the Houthis physically assaulted John Hamen and killed him by ligature strangulation. *See* ECF No. 48 at 113–126 (Test. Dr. Jonathan Arden).

28.     Mr. Hamen received lacerations to the front and back of his skull from blows with a blunt object – one of which was inflicted at least twelve hours prior to death. *See* ECF No. 48 at 128–132 (Test. Dr. Jonathan Arden).

29.     Mr. Hamen suffered four broken ribs sufficient to cause extreme pain. These fractures are consistent with crushing blows such as being stomped on or slammed against a wall or floor. *See* ECF No. 48 at 132–134 (Test. Dr. Jonathan Arden).

30.     Mr. Hamen exhibited contusions and abrasions on his face, back, chest, abdomen, shoulder, elbow and shins. His bruised back, combined with his fractured ribs and other injuries, are all consistent with being forcibly held down during strangulation, among other possible scenarios. *See* ECF No. 48 at 134–138, 141 (Test. Dr. Jonathan Arden).

31.     Mr. Hamen died as the result of asphyxia due to neck compression by ligature. *See* ECF No. 48 at 114–115 (Test. Dr. Jonathan Arden).

32.     According to Dr. Jonathan Arden, a medical examiner with more than twenty years of experience who has performed nearly 3,000 forensic autopsies, John Hamen's cause of death was "strangulation by ligature and the manner of his death was "homicide." ECF No. 48 at 114 (Test. Dr. Jonathan Arden).

33.     The positioning of the ligature mark on Mr. Hamen's neck, the pinpoint hemorrhages on the surface of his eyes or inside of his eyelids, the positioning of his tongue as slightly protruding and his teeth clenched, together with the circumstantial evidence about his captivity, all support these conclusions. *See* ECF No. 48 at 114–123 (Test. Dr. Jonathan Arden).

34.     On or about November 6, 2016, John Hamen was deliberately killed by his captors. *See* ECF No. 48 at 120–126 (Test. Dr. Jonathan Arden).

**E.     The Detention of Mark McAlister**

35.     Between October 20, 2015 and April 29, 2016, the Houthis detained Mark McAlister in their custody and inflicted on him severe pain and suffering, both physical and mental. *See generally* ECF No. 48 at 66–82 (Test. Mark McAlister).

36.     Mr. McAlister was initially held in a concrete room that was twelve feet by nine and a half feet wide, with no light or windows inside the room. A faint light on an outside wall shone through rebar at the top of the door.  The light illuminated the top of the cell, but not the bottom. *See* ECF No. 48 at 71–72 (Test. Mark McAlister).

37.     The room had no toilet, just a hole in the floor, a faucet, and a rubber bucket. ECF No. 48 at 72 (Test. Mark McAlister).

38.     For the first three weeks, Mr. McAlister was interrogated at least three to four times a day. The interrogations continued throughout his imprisonment. ECF No. 48 at 73–76 (Test. Mark McAlister).

39.     Mr. McAlister was allowed outside for approximately one hour only three times during his more than six months of imprisonment. ECF N0. 48 at 77 (Test. Mark McAlister).

40.     Within his first three weeks, Mark McAlister had already lost a substantial amount of weight. *See* ECF No. 48 at 74 (Test. Mark McAlister); *see also* ECF No. 46-1 at 45–46 (Dep. Test. Dr. Al-Junaid).

41.     As his captivity went on, Mark McAlister developed depression, anxiety, and claustrophobia, suffering manic breakdowns and episodes of extreme anxiety. *See* ECF No. 48 at 78–80 (Test. Mark McAlister); *see also* ECF No. 46-1 at 48–50 (Dep. Test. Dr. Al-Junaid).

42.     Mr. McAlister was released by the Houthis on April 29, 2016 after extensive last-minute negotiations by telephone. *See* ECF No. 48 at 85–89 (Test. Mark McAlister).

43.     Mr. McAlister suffers from diagnosed Post-Traumatic Stress Disorder ("PTSD"), depression, anxiety, daily headaches, constant back pain, ringing in his left ear, flashbacks, nightmares, changes to his personality, loss of enjoyment in life, and difficulty sleeping as a result of his time in captivity. *See* ECF No. 48 at 93–98 (Test. Mark McAlister); *see also* ECF No. 46-2 at 36–37 (Dep. Test. Christian McAlister).

44.     Mr. McAlister has been out of work since December 29, 2017, ECF No. 45-1 at ¶¶ 80–81, and has not yet been released by his physician to return to the work force, *see* ECF No. 46-4 at 15 (Dep. Test. Barbara Byers); *see also* ECF No. 48 at 93 (Test. Mark McAlister).

45.     Mr. McAlister hopes to return to work by the end of 2018 as a quality control manager or construction site manager but is unwilling and unable to return to work overseas. *See* ECF No. 48 at 94; *see also* ECF No. 46-4 at 17–19 (Dep. Test. Barbara Byers).

**F.      The Hamen and McAlister Families**

46.     John Hamen had a close relationship with his wife, Jennifer, regularly communicating even when deployed overseas through letters, phone calls, and Skype. ECF No. 45-2 at ¶¶ 6, 9.

47.     Jennifer Hamen was diagnosed with PTSD as a result of John's kidnapping and murder, including the trauma of viewing his body. ECF No. 45-10 at ¶¶ 14–16; *see also* ECF No. 49 at 219–20 (Test. Jennifer Hamen).

48.     As a result of John's death, Jennifer Hamen has been suffering from a lack of energy, nightmares, an inability to sleep, the loneliness of missing John all the time, especially at special family events, and the inability to think about John without thoughts of his torture and death intruding. ECF No. 49 at 222, 226–27 (Test. Jennifer Hamen).

49.     For a period of time, Jennifer Hamen began drinking heavily, but willed herself to quit doing so in order to focus on her children. *See* ECF No. 49 at 225–26 (Test. Jennifer Hamen); ECF No. 49 at 190 (Test. Johann Hamen).

50.     At the time he was killed, John's seven children ranged from ten to eighteen years of age and all depended on him deeply for emotional support, advice, comfort, and financial support. Four of his seven children deal with special educational needs, another aspect of their lives in which he took an active role. ECF No. 45-2 at ¶ 7; *see also* ECF No. 49 at 195–203 (Test. Jennifer Hamen).

51.     The loss of their father had substantial negative impacts and effects on the lives of all seven Hamen children. *See* ECF No. 49 at 221–25 (Test. Jennifer Hamen); *see also* ECF No. 45-2 at ¶¶ 26–29.

52.     Crystal McAlister was substantially changed by her husband's disappearance, driven to help find him by scouring the internet for days at a time, rarely sleeping, and adopting other destructive habits she did not possess before this incident. Her physical and emotional health has been permanently impacted. Her relationships with her children have suffered greatly

as a result. *See* ECF No. 46-2 at 21–22 (Dep. Test. Christian McAlister); *see also* ECF No. 48 at 91 (Test. Mark McAlister); ECF No. 49 at 158–59 (Test. Crystal McAlister).

53.     The marriage between Mark and Crystal McAlister, once a source of peace and strength in their lives, and in the lives of their children, is now stress-filled and broken. Four weeks after Mark's return, Crystal moved out of the house. She moved back in a year later, but their relationship has not been the same. *See* ECF No. 48 at 92 (Test. Mark McAlister); *see also* ECF No. 49 at 159–60 (Test. Crystal McAlister).

54.     The lives of Raquel, Christina, and Christian McAlister have been substantially altered. What before these events were described as close family relationships, revolving around regular visits and reliance upon each other, are now distant and cold. They have each endured physical and emotional difficulties due to stress as well as other struggles, expenses, and inconveniences caused by the changes to their parents from this ordeal. *See* ECF No. 46-2 at 38–40 (Dep. Test. Christian McAlister); *see also* ECF No. 49 at 126–31 (Test. Raquel McAlister); ECF No. 46-3 at 33–36 (Dep. Test. Christina McAlister).

## G.     Iran's Support of the Houthis

55.     The acts of terrorism carried out against John Hamen and Mark McAlister were enabled by the material support and resources provided by Iran to the Houthis through the Iranian Revolutionary Guard Corps ("IRGC"), the IRGC Qods Force ("IRGC-QF"), and Iran's proxy, Hezbollah. ECF No. 44-3 at ¶¶ 73–74; *see also* ECF No. 49 at 19–21 (Test. Michael Pregent); ECF No. 49 at 85 (Test. Dr. Daniel Green); Hr'g Ex. 40.

56.     "The IRGC is dedicated to the spread of fundamentalist Islamist principles throughout the world, and the establishments of fundamentalist Islamist governments in nations other than Iran. The [IRGC-QF] is the branch of the IRGC generally charged with 'foreign

operations.'" *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 104 (D.D.C. 2015); *see also* ECF No. 48 at 176 (Test. Michael Pregent).

57. The IRGC-QF "operates largely autonomously [and] reports directly to the Supreme Leader." *Id.*; *see also* ECF No. 48 at 174 (Test. Michael Pregent). It is Iran's "external operating body" and is responsible for finding and training proxy organizations. ECF No. 48 at 174 (Test. Michael Pregent).

58. Beginning in 2011, the IRGC-QF assigned one of its officers, Abdul Reza Shahlai, to lead Iran's efforts to advise, assist, resource, and train the Houthis. ECF No. 49 at 53 (Test. Dr. Daniel Green).

59. The IRGC-QF "is the principal Iranian organization working with the Lebanese Hizbollah organization's armed elements." *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 104 (D.D.C. 2015); *see also* ECF No. 48 at 185 (Test. Michael Pregent).

60. "Hezbollah is largely under Iranian orders. It's almost entirely acting . . . under the order of the Iranians and being financed almost entirely by the Iranians." *Peterson v. Islamic Republic of Iran*, 264 F.Supp.2d 46, 51 (D.D.C. 2003); *see also* ECF No. 48 at 186 (Test. Michael Pregent).

61. Iran provides approximately $200,000,000 per year to Hezbollah. ECF No. 48 at 186 (Test. Michael Pregent).

62. Iran models its other proxy organizations, such as the Houthis, after its success with Hezbollah. *See* ECF No. 48 at 184–86 (Test. Michael Pregent).

63. As of 2012, a leader of Hezbollah Unit 3800 was responsible for the monthly transfer of at least $50,000 to a political party affiliated with the Houthis. *See* ECF No. 48 at

189–90 (Test. Michael Pregent); *see also* Hr'g Ex. 11 at 1. This money was transferred to the

Houthis at the direction of the IRGC-QF. ECF No. 48 at 190 (Test. Michael Pregent).

64.     Beginning no later than 2009, and continuing to the present day, Iran has

transferred substantial amounts of funding, weapons, military equipment, and missiles to the

Houthis. ECF No. 44-3 at ¶¶ 48–51; *see, e.g.*, ECF No. 49 at 9 (Test. Michael Pregent); ECF No.

49 at 64 (Test. Dr. Daniel Green).

65.     Examples of these weapons transfers, among many others, include interdicted

shipments of explosively formed penetrators in 2012, antiaircraft missiles and C4 in 2013, 180

tons of weapons as part of a single shipment in March of 2015, as well as sniper rifles, machine

guns, and RPGs seized between September 2015 and March 2016. ECF No. 44-3 at ¶¶ 49–50;

*see also* ECF No. 49 at 61–64 (Test. Dr. Daniel Green).

66.     The weapons shipped from Iran to the Houthis include not only standard military

firearms like AK-47s, but sophisticated weapons like missile systems, explosively formed

penetrators and Iranian sea mines. ECF No. 49 at 63–64, 84–84, 105 (Test. Dr. Daniel Green).

67.     The sophistication of the weapons shipped from Iran to the Houthis increased

over time indicating that the IRGC-QF was, during that same period, training the Houthis in the

use of these more sophisticated weapons systems. *See* ECF No. 49 at 63–64 (Test. Dr. Daniel

Green); *see also* ECF No. 49 at 15–16 (Test. Michael Pregent).

68.     Starting in 2013, significant numbers of Houthi fighters also began traveling to

Iran, Iraq, Syria, and Lebanon for military training at the hands of the IRGC-QF and Hezbollah.

*See* ECF No. 44-3 at ¶¶ 68, 81; *see also* ECF No. 49 at 14–15 (Test. Michael Pregent); ECF No.

49 at 90–91 (Test. Dr. Daniel Green).

69.     Hezbollah enables and supports the Houthis media outlets, including facilities based in Hezbollah-controlled Lebanon, which are used by the Houthis to disseminate propaganda within Yemen. *See* ECF No. 49 at 98–99 (Test. Dr. Daniel Green).

70.     In 2014, an Iranian official stated that the IRGC-QF had "a few hundred" military personnel in Yemen to train Houthi fighters. ECF No. 49 at 88 (Test. Dr. Daniel Green).

71.     On January 25, 2015, the same week as the exile of the transitional government from Sana'a, the Iranian Supreme Leader's representative to the IRGC stated that "Hezbollah was formed in Lebanon as a popular force like Basij [Iran's militia]. Similar popular forces were also formed in Syria and Iraq, and today we are watching the formation of Ansar Allah in Yemen." ECF No. 49 at 89 (Test. Dr. Daniel Green).

72.     Without the material support and resources provided by Iran, the Houthis would not have been able to solidify their power and hold the capital city of Sana'a as they did beginning in September 2014 and continuing through the capture and captivity of Mark McAlister and John Hamen. *See* ECF No. 49 at 21 (Test. Michael Pregent); ECF No. 49 at 85 (Test. Dr. Daniel Green).

73.     To this day, Iran continues to direct the IRGC, the IRGC-QF, and Hezbollah to fund and support the Houthis. *See* ECF No. 49 at 9 (Test. Michael Pregent); ECF No. 49 at 84–85 (Test. Dr. Daniel Green).

## II.     PROPOSED CONCLUSIONS OF LAW

### A.     Jurisdiction

74.     This Court has subject matter jurisdiction over Plaintiffs' claims because: 1) Iran is a designated state sponsor of terrorism; 2) Plaintiffs are nationals of the United States; and 3) the claims arise from personal injuries and death caused by acts of hostage taking, torture, and

extrajudicial killing committed with the aid of material support and resources from Iran. *See* 28 USC §1605A(a)(1)–(2).[1]

75.     This Court has personal jurisdiction over Iran in this matter because it has subject matter jurisdiction under the FSIA and Iran was properly served in accordance with 28 USC § 1608(a). *See* ECF No. 25.

**B.     Default**

76.     Despite proper service, Iran has failed to respond or appear in this case. *See* ECF No. 26.

77.     Plaintiffs filed an Affidavit in Support of Default on February 27, 2018 and the Clerk entered default against Iran on March 2, 2018. ECF Nos. 26–27.

78.     In cases brought under 28 U.S.C. § 1605A, default judgment cannot be entered without the plaintiffs establishing "their claim or right to relief by evidence that is satisfactory to the court." *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 236 (D.D.C. 2012).

79.     In meeting that standard, it is up "to the court to determine precisely how much and what kinds of evidence the plaintiff must provide." *Kim v. Democratic People's Republic of Korea*, 774 F. 3d 1044, 1047 (D.C. Cir. 2014).

80.     Within that discretion, the court should "accept as true the plaintiffs' uncontroverted evidence." *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000).

---

[1] These elements "are essentially the same" as what is necessary to establish liability under 28 USC §1605A(c), *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163 (D.D.C. 2017), and thus are discussed in greater detail in the liability section below for the sake of brevity.

81.     Although the court has the discretion to request an evidentiary hearing, "the plaintiff may establish proof by affidavit." *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012).

**C.      Liability**

82.     In FSIA cases, a finding of liability is appropriate if: 1) the defendant is a designated state sponsor of terrorism; 2) the plaintiffs are nationals of the United States; and 3) the claims arise from personal injuries or death caused by acts of hostage taking, torture, and extradjudicial killing committed by the defendant or with the aid of material support or resources from the defendant. *See* 28 USC §1605A(a)(1)–(2).

*1.      Iran is designated as a state sponsor of terrorism.*

83.     Iran "has been designated a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C.A. § 2405(j)) continuously since January 19, 1984." *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 11 (D.D.C. 1998); *see also* Hr'g Ex. 2.

*2.      Each plaintiff is a United States citizen.*

84.     John Hamen (prior to his death), Jennifer Hamen, and their seven children are all citizens of the United States of America. ECF No. 49 at 193–94 (Test. Jennifer Hamen).

85.     Mark McAlister, Crystal McAlister, and their three children are all citizens of the United States of America. ECF No. 48 at 43 (Test. Mark McAlister).

86.     An individual who is an American citizen falls within the term "national of the United States" used in the FSIA. *See* 28 U.S.C. § 1605A(h)(5) (citing 8 U.S.C. § 1101(a)(22)).

       *3.*    *Iran provided material support and resources to the Houthis who committed acts of hostage taking, torture, and extrajudicial killing against Mark McAlister and John Hamen.*

       i.    Acts of hostage taking, torture, and extrajudicial killing occurred.

87.    Under the FSIA, the definition of hostage taking includes someone who "seizes or detains and threatens to kill, to injure or to continue to detain another person . . . in order to compel a third party, namely, a State . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage." *See* 28 U.S.C. § 1605A(h)(2) (citing International Convention Against the Taking of Hostages, Art. 1.1).

88.    The eyewitness testimony of a fellow prisoner and Yemeni political activist, Dr. Abdul Qader Al Junaid, establishes that the Houthis explicitly bragged about their kidnapping of "two Americans" so that "they can take something in exchange." ECF No. 46-1 at 41–42 (Dep. Test. Dr. Al-Junaid).

89.    Moreover, it is not necessary to prove by direct evidence that the hostage taker communicated a demand to the victim or to a third party, but merely that achieving that goal was the captor's intent. *See Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 360 (D.C. Cir. 2006).

90.    Plaintiffs in a FSIA case may use "circumstantial evidence" and "reasonably draw[n] inferences" to establish an alleged hostage-taker's intent. *See Simpson*, 470 F.3d at 362.

91.    The evidence, as described in more detail in the subsequent subparagraphs, demonstrates that the intent of the Houthis was to obtain financial compensation or some other form of consideration or concession for the release of Mark McAlister. *See* ECF No. 48 at 89 (Test. Mark McAlister); *see also* ECF No. 48 at 158–160 (Test. Sealed Witnesses); *see also* ECF No. 49 at 149 (Test. Crystal McAlister).

a.  Mr. Hamen and Mr. McAlister were specifically targeted as hostages because they were Americans, *see* ECF No. 48 at 60–61 (Test. Mark McAlister);

b.  Hostage taking for ransom is consistent with the Houthis tactics, *see* ECF No. 49 at 104 (Test. Dr. Daniel Green);

c.  Four other Americans had been abducted by the Houthis within the year prior to the hostage taking of Mr. Hamen and Mr. McAlister, *see* ECF No. 51 at 1–2;

d.  Similarly situated Americans had been released only after the negotiated payment of ransom monies, ECF No. 48 at 157–58 (Test. Sealed Witness);

e.  The State Department was concerned about making the continued detention of Mark McAlister public because it would have increased his value to the Houthis, *see* ECF No. 49 at 149 (Test. Crystal McAlister);

f.  Shortly before his release, Mr. McAlister witnesses a series of telephone conferences that his captors told him were phone calls to negotiate the terms of his release, *see* ECF No. 48 at 100–01 (Test. Mark McAlister).

92.   Both John Hamen and Mark McAlister were taken hostage by the Houthis on October 20, 2015 and remained as hostages until their death or release. *See generally* ECF No. 48 at 60–89 (Test. Mark McAlister).

93.   The FSIA incorporates a definition of torture that includes:

any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering, . . . whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

*Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 66 (D.D.C. 2015) (quoting the Torture Victim Protection Act of 1991, Section 3(b)(1) (28 U.S.C. 1350 note))

94.   John Hamen was tortured by the Houthis during his captivity. *See* ECF No. 48 at 128–138 (Test. Dr. Jonathan Arden).

16

95.     The FSIA incorporates a definition of extrajudicial killing as performing "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Torture Victim Protection Act of 1991, Section 3(a) (28 U.S.C. 1350 note).

96.     John Hamen was deprived of the core due process rights recognized as indispensable by civilized peoples and his killing was not authorized by a previous judgment pronounced by a regularly constituted court.

97.     Given the purpose of the FSIA, and the discovery impediments caused by a defendant that refuses to appear, a plaintiff satisfies his or her burden of proof for torture and extrajudicial killing by showing that a state sponsor of terrorism provided material support or resources that proximately caused a kidnapping and that the hostage takers have a history of torturing prisoners and killing them without due process. *Kim v. Democratic People's Republic of Korea,* 774 F.3d 1044, 1047 (D.C. Cir. 2014).

98.     "'[C]ommon experience tells us' that where a plaintiff has produced compelling, admissible evidence that the regime abducted the victim and that it routinely tortures and kills the people it abducts, the courts can assume that the defendant [or its proxies] probably tortured and killed the victim." *Id.* at 1049.

99.     According to a State Department report on human rights, the Houthis routinely tortured prisoners and killed them extrajudicially. Hr'g Ex. 39 at 1-2; 4-5; 16.

100.     John Hamen was extrajudicially killed by the Houthis on or about November 6, 2015. *See* ECF No. 48 at 113–116 (Test. Dr. Jonathan Arden).

ii.   The acts of terrorism attributable to Iran led to personal injury and death.

101.   As a result of his hostage taking and inhumane detention, Mark McAlister suffers from PTSD, depression, daily headaches, insomnia, constant nightmares about his captivity, difficulty eating, and chronic back pain. *See* ECF No. 48 at 93–98 (Test. Mark McAlister).

102.   John Hamen suffered severe personal injuries and death as a result of hostage taking and torture. His injuries included lacerations from multiple strikes on the head with one or more blunt objects, four broken ribs, various contusions and abrasions over the rest of his body, and the asphyxiation that ultimately led to his death. *See* ECF No. 48 at 128–138 (Test. Dr. Jonathan Arden).

iii.   Iran's provision of material support and resources to the Houthis proximately caused Plaintiffs' damages.

103.   The term "caused by" found in 28 U.S.C. § 1605A(c) is interpreted "to require only a showing of proximate cause." *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (discussing prior statutory framework, but in the same context and with the same language).

104.   "Proximate cause exists so long as there is 'some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.'" *Estate of John Doe v. Islamic Republic of Iran,* 808 F.Supp.2d 1, 16 (D.D.C. 2011). If the defendant is acting through a proxy, the proxies actions in killing or torturing innocent people must be reasonably foreseeable. *Id.*

105.   Uncontradicted testimony from plaintiffs' experts establishes that the IRGC-QF trained the Houthis in hostage taking and particularly with regard to "high value" targets like Americans who are low level military members or independent contractors. ECF No. 48 at 182–

18

84; 191–92 (Test. Michael Pregent); ECF No. 49 at 15–19 (Test. Michael Pregent); ECF No. 49 at 111–12 (Test. Dr. Daniel Green).

106.    Iran has taught the Houthis a collection of behaviors and strategies to gain and maintain control and these strategies include kidnappings and taking of international hostages in violation of international law. ECF No. 49 at 107, 111–112 (Test. Dr. Daniel Green).

107.    The Houthis would not have been able to take over the capital of Sana'a and maintain it through the time frame when Mark McAlister and John Hamen were kidnapped but for the diplomatic, military and financial assistance of Iran. *Id.*

108.    In the twelve months prior to the kidnapping of Mark McAlister and John Hamen, the Houthis took hundreds of hostages for ransom and tortured hundreds of prisoners. Hr'g Ex. 39 at 1–2, 4, 16.

109.    In addition, in these same twelve months, the Houthis kidnapped at least four Americans. ECF No. 51 at 1–2.

110.    Given the Houthis' history and use of hostage taking as a political weapon, it was reasonably foreseeable that Iran's provision of material support and resources would result in additional kidnappings, including the taking of American hostages.

111.    Iran not only trained the Houthis in certain tactics and strategies, including hostage taking, but Iran also provided the Houthis with a political model based on religious influence and a philosophical hatred of America and Israel, including the chant: "Death to America! Death to Israel!"-- that made the taking of American hostages foreseeable. ECF No. 49 at 96–99, 110–11 (Test. Dr. Daniel Green).

112.    Since at least 2010, Iran has deliberately and materially supported the Houthis in an effort to destabilize Yemen and create an Iranian proxy organization along the Saudi Arabian border. ECF No. 44-3 at ¶¶ 73–76; *see also See* ECF No. 49 at 5–6 (Test. Michael Pregent).

113.    The methods and motives behind the hostage taking of Mark McAlister and John Hamen were consistent with IRGC-QF practices. ECF No. 44-3 at ¶¶ 77, 79; *see also* ECF No. 49 at 16–17 (Test. Michael Pregent).

114.    The hostage taking, torture, and/or extrajudicial killing of Mark McAlister and John Hamen are the direct and proximate results of Iran's provision of support and resources to the Houthis. *See* ECF No. 44-3 at ¶ 77.

115.    The damages to Mark McAlister and John Hamen were reasonably foreseeable consequences of the material support that Iran provided the Houthis. *See* ECF No. 49 at 111–12 (Test. Dr. Daniel Green); *see also* ECF No. 51 at 1–2.

**D.    Damages**

116.    Under 28 U.S.C. § 1605A, damages are available for pain and suffering, economic losses, solatium, and punitive damages. *See* 28 U.S.C. § 1605A(c).

*1.    Pain and suffering.*

117.    In FSIA cases, the court will compare the facts of the instant case with prior FSIA cases to ensure that "individuals with similar injuries receive similar awards" for their respective pain and suffering. *Moradi*, 77 F. Supp. 3d at 70.

118.    For cases involving prolonged periods of hostage taking, the method for calculating damages is to award hostages $10,000 per day for pain and suffering experienced while captive and then award additional compensation for damages that are "likely to continue to

endure" beyond the individual's release from captivity. *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 135 (D.D.C. 2005); *see also* ECF No. 52.

119.    An award of $6,920,000 to Mark McAlister is appropriate to compensate him for his 192 days in captivity, the pain and suffering he endured while imprisoned, and the pain and suffering he has experienced, and will continue to experience, after his release.

120.    This award is consistent with the pain and suffering damages awarded to the plaintiff in a prior FSIA case who was the same age as Mark McAlister, was detained for a similar period of time, and who continued to suffer from permanent injuries similar to those experienced by Mr. McAlister. *See Moradi*, 77 F. Supp. 3d at 70.

121.    In FSIA cases involving bombings, terrorist attacks, or death after a brief period of captivity, the critical inquiry "is whether the victim suffered 'conscious pain' for some period of time." *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 259 (D.D.C. 2014); *see also* ECF No. 52.

122.    For a period of suffering equal to "several hours or less, courts . . . have rather uniformly awarded $1 million." *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 (D.D.C. 2006). Greater awards correspond to greater degrees and lengths of suffering. *See, e.g.*, *Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13, 18, 23 (D.D.C. 2002); *Higgins v. Islamic Republic of Iran*, Case No. 1:99cv377, 2000 WL 33674311, at *8 (D.D.C. Sept. 21, 2000).

123.    John Hamen was subjected to substantial conscious periods of pain and suffering, up to and including a prolonged period of strangulation. *See* ECF No. 45-3 at ¶¶ 35–37; *see also* ECF No. 48 at 113–38 (Test. Dr. Jonathan Arden).

124.    An award of $5,000,000 to the Estate of John Hamen is appropriate compensation for the pain and suffering experienced by John Hamen between October 20, 2015 and November 6, 2015.

        *2.      Economic losses.*

125.    The economic losses suffered by the Estate of John Hamen as a result of the extrajudicial killing of John Hamen are $2,769.948.00. ECF No. 46-5 at 24 (Dep. Test. Dr. James Koch); *see also* Hr'g Ex. 38.

126.    Mark McAlister is presently unable to work due to his PTSD. *See* ECF No. 46-4 at 15 (Dep. Test. Barbara Byers).

127.    If he is medically cleared to return to work at the beginning of 2019, Mr. McAlister is likely placeable in competitive employment within the United States as a quality control manager or a construction project manager. *See* ECF No. 46-4 at 18–19 (Dep. Test. Barbara Byers).

128.    The economic losses sustained by Mr. McAlister as a result of his current inability to be employed and the reduction in his earning capacity for the remainder of his anticipated work-life are $1,036,405.00. *See* ECF No. 47-3; *see generally* testimony of Dr. James Koch; *see also* Hr'g Exs. 36–38. These calculations are based on the fact that Mr. McAlister continued to be paid by AC4S through almost all of 2017 and hopes to return to work by January 1, 2019 as a quality control manager or construction project manager near his home in Tennessee at a lower pay scale than his job with AC4S. *See generally* testimony of Barabara Byers and Dr. James Koch; Hr'g Ex. 38.

3.      *Solatium awards.*

129.    The baseline approach to awarding solatium damages to the families of deceased victims suggests awards of eight million for spouses and five million for the victims' parents and children. *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 260 (D.D.C. 2014). These baseline figures are halved if the terrorism victim survives. *Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229, 269 (D.D.C. 2006).

130.    Upward departures from this framework are merited when a plaintiff shows "an especially close relationship" with the victim, "medical proof of severe pain, grief or suffering," or that the circumstances of the attack made the plaintiff's "suffering particularly more acute or agonizing." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26–27 (D.D.C. 2011).

131.    Due to the ages of the Hamen children, their close relationship with and dependence on John Hamen, the circumstances of learning of John's death, and the medical diagnosis of PTSD for Jennifer Hamen, it is appropriate for the Hamen family plaintiffs to be awarded a fifty-percent increase over the baseline framework.

132.    Solatium damages are appropriate for Jennifer Hamen in the amount of $12,000,000, and to each of her children in the amount of $7,500,000.

133.    Crystal McAlister, Raquel McAlister, Christina McAlister, and Christian McAlister maintained close relationships with Mark McAlister before he was taken hostage. *See* ECF No. 48 at 46–47 (Test. Mark McAlister). A baseline framework award of solatium is appropriate.

134.    Solatium damages are appropriate for Crystal McAlister in the amount of $4,000,000.00.

23

135.    Solatium damages are appropriate for Raquel McAlister, Christina McAlister, and Christian McAlister in the amount of $2,500,000 each.

        *4.    Punitive damages.*

136.    Punitive damages in FSIA cases are determined based on four factors:

> (1) the nature of the act itself, and the extent to which any civilized society would find that act repugnant; (2) the circumstances of its planning; (3) Defendants' economic status with regard to the ability of Defendants to pay; and (4) the basis upon which a Court might determine the amount of an award reasonably sufficient to deter like conduct in the future, both by the Defendants and others.

*Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 33 (D.D.C. 1998).

137.    Here, an award of $200,000,000 in punitive damages to each affected family is appropriate. *See, e.g.*, *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 87 (D.D.C. 2017); *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012); *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008).

        Respectfully submitted,

            /s/ Kevin A. Hoffman
        Kevin A. Hoffman (DC Bar No. 1044559)
        Randy D. Singer *pro hac vice*
        SINGER DAVIS, LLC
        1209A Laskin Road
        Virginia Beach, VA 23451
        Phone: (757) 301-9995
        Fax: (757) 233-1084
        Email: kevin.hoffman@singerdavis.law
        Email: randy.singer@singerdavis.law
        *Counsel for Plaintiffs*

**Certificate of Service**

I hereby certify that on this, the 14th day of August 2018, copies of the foregoing were served on all registered parties via CM/ECF, concurrent with the filing of the same.

                                           _____/s/ Kevin A. Hoffman_____

                                         Kevin A. Hoffman (DC Bar No. 1044559)
Randy D. Singer *pro hac vice*
SINGER DAVIS, LLC
1209A Laskin Road
Virginia Beach, VA 23451
Phone: (757) 301-9995
Fax: (757) 233-1084
Email: kevin.hoffman@singerdavis.law
Email: randy.singer@singerdavis.law
*Counsel for Plaintiffs*