# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JENNIFER HAMEN, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> ISLAMIC REPUBLIC OF IRAN, <br><br> *Defendant.* | Civil Action No. 16-1394 (RDM) |

## MEMORANDUM OPINION

This case arises from the kidnapping and detention of two United States citizens—and the murder of one of those citizens—by members of the Houthi militant group in Yemen. In October 2015, Mark McAlister and John Hamen were abducted from the airport in Sana'a, Yemen and transported to a detention facility. Hamen was killed sixteen days later. McAlister was held at that facility for over six months, and then released. Plaintiffs, who are all U.S. nationals, bring this suit against the Islamic Republic of Iran, invoking the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(a). They rely on another provision in the statute, § 1605A(c), to supply a federal cause of action, alleging that Iran provided "material support" to the Houthis, who used that support to engage in acts of hostage taking, torture, and extrajudicial killing. Plaintiffs allege that the Houthis have benefitted from and relied on training, funding, direction, and support from Iran and that, without Iranian aid, the Houthis could not have kidnapped and detained McAlister and Hamen or murdered Hamen.

Iran has not answered or otherwise appeared in this action and, at Plaintiffs' request, the Clerk of the Court entered a default. Plaintiffs now move for a default judgment against the

Islamic Republic of Iran. Dkt. 31. As explained below, Plaintiffs have established their right to relief under 28 U.S.C. § 1605A(c). Accordingly, Plaintiffs' motion for the entry of a default judgment against the Islamic Republic of Iran will be granted. The Court will refer the matter to a special master to assist in evaluating Plaintiffs' damages.

## I. INTRODUCTION

Plaintiffs Mark McAlister, the estate of John Hamen, and eleven of their family members, bring this action against Defendants the Islamic Republic of Iran and the Syrian Arab Republic for "provi[ding] material military and economic support" to the Yemeni militant group that abducted McAlister and Hamen, held them captive, and murdered Hamen, alleging that the "violence . . . [was] an expected and welcomed result of such support." Dkt. 1 at 16–17 (Compl. ¶¶ 94, 106). Plaintiffs effected service on the Islamic Republic of Iran in December 2017, Dkt. 25, and Iran has not answered, filed a motion under Federal Rule of Civil Procedure 12, or otherwise appeared, Dkt. 26. In July 2018, Plaintiffs voluntarily dismissed their claims against the Syrian Arab Republic. Dkt. 42.

Plaintiffs now seek entry of a default judgment against the Islamic Republic of Iran pursuant to Federal Rule of Civil Procedure 55. Dkt. 32. Entry of a default judgment is not automatic, however, and requires the Court to exercise its sound discretion. *See Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005); *Sanchez v. Devashish Hospitality, LLC*, 322 F.R.D. 32, 36 (D.D.C. 2017); *Boland v. Yoccabel Const. Co.*, 293 F.R.D. 13, 17 (D.D.C. 2013) (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)). Most notably, the Court must—in all cases— satisfy itself that it has subject-matter jurisdiction over the claims and personal jurisdiction over the defendant. *See Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) ("A default judgment rendered in excess of a court's jurisdiction is void."); *Mwani*, 417 F.3d at 6 (explaining

that a court must "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant").

In cases brought against a foreign state, however, the Court's discretion to enter a default judgment is more narrowly circumscribed. By statute, no federal or state court may enter a default judgment against a foreign state or instrumentality "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This is the same standard that applies to default judgments against the United States under Federal Rule of Civil Procedure 55(d). *See Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017); *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003). In a case such as this, which alleges that a foreign state materially supported acts of terrorism, the district court must determine "how much and what kinds of evidence the plaintiff must provide." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014). And the Court must do so in light of both Congress's purpose in enacting § 1605A—that is, to "compensate the victims of terrorism [so as to] punish foreign states who have committed or sponsored such acts and [to] deter them from doing so in the future," *id*. at 1048 (citation omitted)—and the difficulty in obtaining "firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign," *Owens*, 864 F.3d at 785. As a result, Plaintiffs carry the burden of (1) producing evidence sufficient to show that their claims fall within the state-sponsored terrorism exception to the FSIA, *see* 28 U.S.C. § 1605A(a); *Owens*, 864 F.3d at 784; (2) establishing that Iran was served in accordance with the FSIA, *see* 28 U.S.C. § 1608(a); and (3) demonstrating their right to relief under federal, *see* 28 U.S.C. § 1605A(c), or state law, *Owens*, 864 F.3d at 808, by offering evidence "satisfactory to the court," 28 U.S.C. § 1608(e).

Against this backdrop, the Court held a two-day hearing on liability, Dkt. 48 (Jul. 25, 2018 Hrg. Tr.), Dkt. 49 (Jul. 26, 2018 Hrg. Tr.), and received additional evidentiary submissions, Dkt. 44-1, Dkt. 44-2, Dkt. 44-3, as well as proposed findings of fact and conclusions of law from Plaintiffs, Dkt. 53. In the course of the hearing, the Court applied the Federal Rules of Evidence, but did so on the understanding, first, that it has "the authority—indeed, . . . the obligation—to 'adjust [evidentiary requirements] to . . . differing situations,'" *Han Kim*, 774 F.3d at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)) (modifications in *Han Kim*), and, second, that the Court need not "step into the shoes of the defaulting party and pursue every possible evidentiary challenge," *Owens*, 864 F.3d at 785. Expert testimony, moreover, is not only entirely proper, but often sufficient, *see id.* at 787–89, and even indispensable in "terrorism cases . . . because firsthand evidence of terrorist activities is difficult, if not impossible to obtain." *Id.* at 787. Whether through expert testimony or other competent evidence, the Court must ultimately determine whether the Plaintiffs have "substantiate[d] [the] essential element[s] of jurisdiction" with admissible evidence. *Id.* at 786.

Based upon the record and the facts available for judicial notice, the Court now makes the following findings of fact and conclusions of law.

## II.  FINDINGS OF FACT

Plaintiffs' evidentiary presentation included testimony from eleven witnesses (including experts), and over a dozen exhibits (including government reports). The Court heard from Michael Pregent, a Senior Fellow at the Hudson Institute and former intelligence officer and fellow at the National Defense University; Dr. Daniel Green, a Defense Fellow at the Washington Institute for Near East Policy; Dr. Jonathan Arden, a forensic pathologist who previously served as the Chief Medical Examiner of the Northern Virginia Region and First

Deputy Chief Medical Examiner for the City of New York; and representatives from each of the families of the abducted or murdered Americans. *See* Dkt. 48 (Jul. 25, 2018 Hrg. Tr.); Dkt. 49 (Jul. 26, 2018 Hrg. Tr.).

Based on the testimony of these witnesses and the exhibits admitted into evidence, the Court finds as follows: First, Iran provided the Houthis with significant support, either directly or indirectly through other proxies, in the form of training, weapons, and funding, as part of its larger strategy to use proxy groups to destabilize the region. Second, the Houthis would not have been in a position to effectuate the abduction of McAlister and Hamen from the Sana'a Airport, or the murder of Hamen, without the assistance of Iran. Third, the Houthis would not have attempted the kidnapping and hostage-taking of Mark McAlister and John Hamen without the backing of Iran. The Court ultimately concludes that, through these actions, Iran supported the hostage taking of McAlister and the murder of Hamen. The Court will discuss the factual foundation for each of these conclusions in turn.

## A.    Iran's Provision of Support to the Houthis

### 1.    *Overview of Iran's Proxy Strategy*

Since the Iranian Revolution in 1979, Iran has sought to maintain influence over other countries in the region, such as Lebanon, Syria, and Yemen, by pursuing a strategy of "destabilizing" and "fractur[ing]" the governments in those countries. Dkt. 48 at 173–74 (Pregent).[1] One of the principal ways that Iran has sought to achieve this goal is by financing

---

[1] Many of the Court's findings in this section are derived from the expert testimony of Michael Pregent and Dr. Daniel Green. Having considered the requirements of Federal Rule of Evidence 702, the Court qualified Pregent as an expert on the IRGC Qods Force and Iranian efforts to influence political activity in Yemen, Iraq, Syria, and Lebanon, Dkt. 48 at 172, and qualified Dr. Green as an expert on terrorism, insurgency and counter-insurgency issues generally in the Middle East, and particularly as it relates to Iran and its activities in Yemen, Dkt. 49 at 41.

and supporting local groups known as "proxy organizations," which Iran, in turn, uses to "strategically carry out Iran's goals." *Id.* (Pregent). By using these groups as surrogates, Iran is able to achieve its goals in the region, while simultaneously denying responsibility for the actions of its proxies.

The Iranian military body responsible for identifying and training proxy organizations is known as the Islamic Revolutionary Guard Corps Qods Force ("Qods Force"). *Id.* at 173–74 (Pregent). The Qods Force is the "external operating body" of the Iranian government, *id.* at 174 (Pregent), and "focuses on conducting foreign operations which support insurgents and terrorists," Dkt. 32-4 at 8 (Green Aff. ¶ 33). The commander of the Qods Force, General Qasem Soleimani, reports directly to the Supreme Leader of Iran, Ali Khomeini. Dkt. 48 at 174 (Pregent).

The Qods Force coordinates with proxy militant groups to conduct terrorist attacks by providing weapons, training, funding, and guidance. *Id.* at 179–80 (Pregent); Ex. 10 at 3.[2] Once the Qods Force develops a relationship with a group, it supplies weapons, which range from small arms such as AK-47s to sophisticated weaponry such as antitank weapons and explosively

---

[2]  Under the public records exception to the hearsay rule, "a record or statement of a public office" is admissible if it contains "factual findings . . . from a legally authorized investigation" and does not "indicate a lack of trustworthiness." Fed. R. Evid. 803(8); *see also Owens*, 864 F.3d at 792. Exhibit 10 is a press release, entitled "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," Ex. 10 at 1, that describes U.S. Government actions "to counter Iran's . . . support for terrorism," *id.* at 1. "Pursuant to the 'broad approach to admissibility' under Rule 803(8), a court may also admit 'conclusion[s] or opinion[s]' contained within a public record," and, "[o]nce proffered, a public record is presumptively admissible, and the opponent bears the burden of showing it is unreliable." *Owens*, 864 F.3d at 792 (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)). As the press statement contains summaries of U.S. government actions and lawful government investigations and bears no indicia of unreliability, the Court admits it into evidence under Fed. R. Evid. 803(8). For the same reasons, the Court concludes that Exhibit 11, which is a press release entitled "Treasury Sanctions Hezbollah Leadership," Ex. 11 at 1, is admissible.

formed penetrators, depending on the group's training and capability. Dkt. 48 at 180–81 (Pregent); Dkt. 49 at 63–64 (Pregent). The Qods force also trains proxies to use those weapons, both in the home countries of the proxies and in other areas in the region. Dkt. 48 at 182–83 (Pregent).

In addition to military support and training, the Qods Force "exports" to its proxies a "collection of behaviors[,] tactics, and capabilities," Dkt. 49 at 111 (Green), which includes other terrorism techniques such as "bomb making" and "assassination and kidnapping," Dkt. 48 at 182 (Pregent). Of particular relevance here, Iran encourages its proxy groups to kidnap "high value targets" by providing "incentives" in the form of "a bounty or reward." *Id.* at 191–92 (Pregent). The "highest value target" to Iran is an American. *Id.* (Pregent). The Qods Force also typically exercises control over its proxies' efforts to kidnap Americans because such operations and subsequent negotiations are complex and can potentially implicate Iran if not strategically executed. *Id.* at 16–18 (Pregent).

According to the U.S. Department of the Treasury, the Qods Force has supported militant groups including the Taliban, Hamas, and—most relevant here—the Lebanese Hezbollah ("Hezbollah"). Ex. 10 at 3. As a result of these activities, the State Department has designated Iran as a state sponsor of terrorism, *see* U.S. Dep't of State, *State Sponsors of Terrorism*, available at https://www.state.gov/j/ct/list/c14151.htm (last visited August 7, 2019), and the Treasury Department has designated the IRGC's Qods Force as providing support for terrorism, Ex. 10 at 1, 3.

2.      *Hezbollah*

Hezbollah's role as an Iranian proxy force is relevant to this case in two respects. First, it serves as an example of how Iran cultivates militant organizations in other countries and employs

them as surrogates—a model that Iran applied to the Houthis in Yemen. Dkt. 48 at 185–86 (Pregent). Second, Hezbollah served as a liaison between Iran and the Houthis to provide training and regular financial support.

The Qods Force has developed Hezbollah as a proxy for over 20 years. *See id.* at 185 (Pregent). As a result of that ongoing and established relationship, Hezbollah is today regarded as the "gold standard" for what Iran hopes to achieve with proxy militias in Afghanistan, Syria, Iraq, and Yemen. *Id.* at 184–85 (Pregent). In particular, Hezbollah is directed by the Qods Force to conduct external operations on Iran's behalf, and, in order to facilitate those efforts, Iran provides Hezbollah with a budget of roughly $200 million per year. *Id.* at 185–86 (Pregent). [3] Hezbollah's "3800 Unit" is responsible for Hezbollah's training activities that support the proxy militias—including the Houthis—and the 3800 Unit develops a closer relationship with the proxies through proximity and frequent interactions. *Id.* at 190 (Pregent). To further strengthen Hezbollah's relationship with other proxies, it often distributes funding to these groups at Iran's direction. *Id.* at 191 (Pregent). The Qods Force also maintains oversight over Hezbollah and its 3800 Unit by sending advisers to oversee the Unit and to meet with proxy leadership. *Id.* at 192 (Pregent).

Also relevant here, the Unit's training of proxy groups typically includes not only weapons training, but also training in kidnapping and hostage-taking techniques, focusing on American targets. Dkt. 49 at 16 (Pregent). Notably, Hezbollah trains proxy groups to target lower profile Americans (*i.e.*, not high-ranking officials or diplomats) such as enlisted soldiers

---

[3] To the extent these dollar figures "recite potentially inadmissible facts," the Court concludes that they appropriately "disclose" a portion of "the factual basis for" the admissible expert testimony. *Owens*, 864 F.3d at 790. The same is true with respect to various other "potentially inadmissible facts" referenced in Plaintiffs' expert testimony and reports. *Id.*

and contractors, to avoid triggering a military response. *Id.* at 16–17 (Pregent). Specific techniques include using American accents either to gain access to the target or to interrogate the detainee. *Id.* at 18 (Pregent).

Based on this evidence, and consistent with numerous other decisions from this Court, the Court finds that Hezbollah is an Iranian proxy. *See, e.g.*, *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 60 (D.D.C. 2018); *Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, 313 F. Supp. 3d 50, 54–55 (D.D.C. 2018); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 53 (D.D.C. 2003); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 292 (D.D.C. 2003).

3. *The Houthis*

a. Origins

The Houthis originate from the Saada Governorate region in the northwest of Yemen, near the border of Saudi Arabia. The group began as a localized insurgency, which protested the Yemen government's economic discrimination and political marginalization of the region. Dkt. 49 at 43–44 (Green); Dkt. 32-4 (Green Aff. ¶ 20). The Houthis, like many northern Yemenis, subscribe to the Zaidi Shia religion, which differs from the Iranian Shia religion and from the religion of most Yemenis, which is Sunni. Dkt. 49 at 44 (Green). The Houthis are named for one of its leading families—the al-Houthis—and adopted that family name when the group's first leader, Hussain al-Houthi, was killed by government forces. Hussain al-Houthi "embrace[d] the radical elements of Iranian foreign policy" since travelling there in 1986, including "a rabid opposition to the United States and Israel." Dkt. 32-4 at 6 (Green Aff. ¶ 24). Before his death, Hussain al-Houthi popularized the Houthi chant, known as the "sarkha," of "God is great! Death to America! Death to Israel! A curse upon the Jews! Victory for Islam!" Dkt. 51-1 at 1 (Green

Supp. Aff. ¶¶ 5–6).  These words also appear in Arabic on patches worn by Houthi soldiers.  Dkt. 48 at 52–53 (McAlister).

Until the early 2000s, the Houthis remained a localized insurgency.  Dkt. 49 at 43–44 (Green).  In 2004, however, the government of Yemen launched a military campaign against the Saada Governorate region, and the al-Houthi family in particular, which triggered a period of "six wars" between the Houthis and the Yemen government.  *Id.* at 45–46 (Green).  Even at this early stage in the Houthis' history, Iran supported and exerted influence over the group, but, Iran's influence was limited at the time, and the Yemen government remained strong.  *Id.* at 46–47, 96 (Green).  The six wars officially came to an end in 2010, when, after much death and destruction, both sides signed a peace accord.  *Id.* at 46 (Green).

In 2011, the Arab Spring movement took hold in Yemen, which led to broad-based demonstrations against the government, which, coupled with "poor governance, corruption, and incompetence[,] . . . contributed to a general collapse of government control throughout the country."  Dkt. 32-4 at 7 (Green Aff. ¶ 30); Dkt. 49 at 48 (Green).  In 2012, Ali Abdullah Saleh resigned as President of Yemen, and a provisional government, backed by the United Nations and international community, took control until Saleh's former vice-President, Abdrabbuh Mansur Hadi, was elected about a year later.  Dkt. 49 at 49–51 (Green).  Saleh retained power and influence, however, particularly in his home province in the north of Yemen, with sections of the Yemen military remaining loyal to him.  *Id.* at 50, 54 (Green).

During this political transition, Iran took steps to "deepen its relationship with the Houthis and to expand its assistance to the group."  Dkt. 32-4 at 8 (Green Aff. ¶ 31); *see also* Dkt. 49 at 6 ("[T]he IRGC-Qods Force increase[d] the Houthis' capabilities during the 2010– 2011 uprisings . . . .").  With Iran's backing, the Houthis took up arms against Yemen's

government and began to infiltrate Yemen's capital city of Sana'a. Dkt. 49 at 54 (Green). During this time, the Houthis—enabled by Iran—also joined forces with former President Saleh, forming a coalition with the goal of isolating and marginalizing the Yemen government under Hadi's authority. *Id.* at 54 (Green). In 2014, the Houthis attacked Sana'a, seizing the city and forcing President Hadi to flee to the south of Yemen. *Id.* at 53–54 (Green). The Houthis solidified their control of the city by seizing the homes of opponents who had fled, undertaking an assassination campaign against prominent leaders, and initiating a detention program against potential opponents. *Id.* at 55–56 (Green). When the Houthis' took control of Sana'a, the United States withdrew its diplomatic personnel in February 2015. *Id.* at 54–55 (Green). By the time Mark McAlister and John Hamen flew to Sana'a on October 20, 2015, the city and its airport were firmly under Houthi control. *Id.* at 55 (Green).

        b.        <u>Iran's Provision of Funding, Weapons, and Training</u>

There is ample evidence that Iran has facilitated arms shipments to the Houthis since at least 2009. *Id.* at 58–64 (Green); Dkt. 32-4 at 13 (Green Aff. ¶¶ 49–50). The evidence submitted at trial showed that numerous shipments originating in Iran and carrying Iranian-made weapons—ranging from small arms to advanced weaponry—have been recovered on their way to Houthi territory. Dkt. 49 at 58–64 (Green). Arms shipments including ammunition, rocket-propelled grenade launchers, 122 millimeter rockets, C4 plastic explosive blocks, electrical equipment that can be used to manufacture improvised explosive devices, AK-47s, unmanned aerial vehicles, and explosively formed penetrators, have been intercepted on their way to Houthi territory. *Id.* at 58–59, 63 (Green). The weapons shipped, moreover, have become increasingly sophisticated over time. Dkt. 49 at 63 (Green).

There is also evidence of the use of Iranian-made weapons: Iranian-made SCUD missiles were fired at Saudi Arabia from Houthi-controlled territory, *id.* at 65–66 (Green); *id.* at 7–12 (Pregent); the Houthis used an Iranian "Shark 33" attack boat to attack the Saudis, *id.* at 13–14 (Pregent); and the Houthis used Iranian-made sea mines in southern Yemen, *id.* at 66 (Green). Iran has continued to supply arms and arms-related material to the Houthis despite agreeing not to do so as part of the 2015 Joint Comprehensive Plan of Action with the United States and United Nations. *Id.* at 70–85 (Green). There is also no indication that Iran provided support of this type to any group in Yemen other than the Houthis, *id.* at 14 (Pregent), confirming the conclusion that the arms shipments were intended for the Houthis. The repeated nature of the shipments and the variety and sophistication of armaments, moreover, reflect a significant, long-term commitment on behalf of Iran to militarily support the Houthis. Dkt. 32-4 at 14 (Green Aff. ¶ 51). Iran has also provided financial support to the Houthis. There is evidence, for example, that Iran directed Hezbollah's 3800 Unit to provide the Houthis $50,000 per month, or about $600,000 per year. Dkt. 48 at 187–91 (Pregent).

In addition to providing financial support and weapons, Iran has provided training to the Houthi militants, either directly or through Hezbollah. Since 2009, Houthi militants have received training at Hezbollah training camps, Dkt. 49 at 15 (Pregent), including in Lebanon, Syria, and Iraq, *id.* at 96 (Green). Beginning in 2011, Iran assigned Qods Force officer Abdul Reza Shahlai as the leader of its efforts to "advise, assist, resource, and train the Houthis," Dkt. 32-4 (Green Aff. ¶ 32); Dkt. 49 at 53, 64, 96 (Green). In 2013 and 2015, select Houthis participated in combat in Syria after having undergone training in Hezbollah training camps. Dkt. 49 at 15–16 (Pregent). In October 2014, several 3800 Unit members were captured in

Yemen while training the Houthis. *Id.* at 18–19 (Pregent). Hezbollah leaders have also confirmed training the Houthis in Yemen, Lebanon, and Iran. Dkt. 32-4 at 11 (Green Aff. ¶ 43).

There is also evidence that Iran trained the Houthis on hostage taking and kidnapping techniques. Although kidnapping was used as a political tool in Yemen prior to Iran's influence, those tactics predominantly involved kidnapping other Yemenis. Dkt. 49 at 68–69 (Green). In 2015, however, the Houthis took at least four civilian Americans hostage prior to the kidnapping of McAlister and Hamen. Dkt. 51-1 at 1 (Green Supp. Aff. ¶¶ 1–4); Dkt. 49 at 108 (Green). Plaintiffs' experts agree that due to the risk and complexity of kidnapping Americans and holding them hostage, the Houthis would not have taken Americans and other foreigners hostage without the backing of Iran. Dkt. 49 at 69 (Green); *id.* at 21–22 (Pregent).

Although Iran has denied assisting the Houthis, *id.* at 76 (Green), Iran's Supreme Leader Ayatollah Ali Khamenei stated in May of 2015 that "Yemen, Bahrain and Palestine are oppressed, and we protect oppressed people as much as we can." *Id.* at 87 (Green). Similarly, Iranian Brigadier General Masoud Jazayeri, the deputy chief of staff of the Iranian armed forces, stated in March of 2016 that "[t]he Islamic Republic felt its duty to help . . . the people of Yemen in any way it can and to a level necessary." *Id.* at 88 (Green). In 2014, an unnamed senior Iranian official stated that "[t]he Qods Force had a 'few hundred' military personnel in Yemen to train Houthi fighters." *Id.* at 88 (Green). In light of the evidence as whole, these statements show that Houthi support was authorized by Iranian officials at the highest level.

Without Iranian backing, the Houthis would not have been able to exert power or control outside of their home province of Saada; would not have been able to seize the capital city of Sana'a or to maintain control of the city; and would not have developed the tactic of taking American nationals hostage. *Id.* at 112–13 (Green); *id.* at 20–22 (Pregent).

**B. Abduction of Mark McAlister and John Hamen**

John Hamen III and Mark McAlister worked for a private contractor, Advanced C4 Solutions ("AC4S"), which was under contract with the United States Department of State for the maintenance and operation of the Sheraton Hotel property adjacent to the U.S. Embassy in Sana'a. Dkt. 32-1 at 1–2 (McAlister Decl. ¶¶ 6–7). When Yemen's civil war and armed conflict made Sana'a unsuitable for a commercial enterprise, Sheraton provided the hotel to the State Department to use as lodging for Embassy employees and guests. *Id.* at 2 (McAlister Decl. ¶¶ 8–9). The State Department, in turn, contracted with AC4S to improve the building's physical security and upgrade communications. *Id.* at 2 (McAlister Decl. ¶ 9). Although the United States evacuated its diplomatic personnel in February 2015, the United Nations was given control of the Sheraton property and continued construction to house United Nations' personnel.

McAlister worked for AC4S as a Quality Control Manager and had previously travelled to Yemen two times in 2014 and 2015 to oversee construction on the Sheraton. Dkt. 48 at 48–54 (McAlister). On both previous trips, McAlister and his team were forced to leave due to the escalating military conflict in Sana'a. *Id.* at 40–54 (McAlister). Hamen was hired by AC4S to do security work on the Sheraton project, *id.* at 56 (McAlister), after he retired from 22 years of service in the U.S. Army, Dkt. 49 at 208 (Jennifer Hamen). The October 2015 Yemen trip was Hamen's first overseas trip with AC4S.

Upon McAlister and Hamen's arrival in Sana'a at approximately 4:00 p.m. on October 20, 2015, they were met by the hotel manager, they had their visas stamped, and they went through passport control. Dkt. 48 at 59 (McAlister). As they were about to enter the area of the airport where they could retrieve their luggage, McAlister and Hamen were stopped by a man asking for their passports. *Id.* at 60 (McAlister). After looking at the passports, the man asked

McAlister and Hamen: "American?" and McAlister replied in the affirmative. *Id.* The man then told McAlister and Hamen to wait in an area behind them with "four or five chairs." *Id.* McAlister and Hamen waited in that area for "approximately two hours." *Id.* at 61 (McAlister). While they waited, a British passenger was also detained in the same area but was allowed to leave after a short while. *Id.* at 60–61 (McAlister). At some point, Hamen noted that the hotel manager and other personnel that were going to escort them from the airport were gone. *Id.* at 61 (McAlister). During this time, McAlister also observed that the man who had told them to wait was "on the phone quite a bit." *Id.* at 61 (McAlister). After "approximately two hours," three soldiers in camouflage with AK-47s arrived. *Id.* (McAlister). McAlister recognized the soldiers as those who were loyal to President Saleh and who were now allied with the Houthis. *Id.* at 62–63 (McAlister). At this point, the man who had told them to wait took McAlister and Hamen to another area in the airport where the man searched their luggage. *Id.* at 61–62 (McAlister).

After the search, three more Houthi guards arrived at the airport, tied McAlister and Hamen's hands behind their backs, and blindfolded them. *Id.* at 64 (McAlister). The Houthi guards then escorted McAlister and Hamen out of the airport and put them into a van. *Id.* at 64–65 (McAlister). The inside of the van was lined with woven wire, and a Houthi guard who spoke English sat across from McAlister and Hamen. *Id.* at 65 (McAlister). After about 20 minutes in the van, they arrived at a detention facility where their handcuffs and blindfolds were removed, and their captors, while threatening them with tasers, told them to remove their clothing and to reveal the passwords to their phones and computers. *Id.* at 66–67 (McAlister). McAlister and Hamen were then blindfolded again and separated. *Id.* at 67 (McAlister). McAlister never saw Hamen again.

## C.    Detention of Mark McAlister

McAlister was detained by the Houthis from October 20, 2015 to May 1, 2016—for a total of six months and eleven days.[4]  *See id.* at 58, 77 (McAlister).  He was initially held in a concrete room that was twelve feet by nine and a half feet wide, with no light or windows inside the room.  Only a faint light shone through rebar at the top of the door, illuminating the top of the cell.  *Id.* at 71–72 (McAlister).  The room had no toilet—just a hole in the floor—and a rubber bucket.  *Id.* at 72 (McAlister).

For the first three weeks, McAlister was interrogated at least three or four times a day, *id.* at 73–76 (McAlister), and the interrogations continued throughout his captivity.  McAlister lost a substantial amount of weight in the first three weeks of his detention.  *Id.* at 74 (McAlister); Dkt. 46-1 at 45–46 (Al-Junaid Dep.).  During his six months of detention, McAlister was only allowed outside three times for approximately one hour each time.  Dkt. 48 at 77 (McAlister).  He was never given any new clothes and only had a bar of soap with which to wash his clothes.  *Id.* at 84 (McAlister).  As a result of these conditions, McAlister developed depression, anxiety, and claustrophobia, and suffered psychological breakdowns and episodes of extreme anxiety.  *Id.* at 78–80; Dkt. 46-1 at 48–50 (Al-Junaid Dep.).

McAlister was released by the Houthis on May 1, 2016.  Dkt. 48 at 77 (McAlister).  Before his release, McAlister was taken to a safe house near the border of Saudi Arabia, where he was held in a room with a man on the telephone.  *Id.* at 87 (McAlister).  McAlister asked who the man on the telephone was talking to and was told that the man was "negotiat[ing]" "for [his] release."  *Id.*  When McAlister reached the border, the man who was on the telephone walked to

---

[4]  The Amended Complaint alleges that "Mark McAlister was released into United States government custody on April 29, 2016."  Dkt. 29 at 13 (Amd. Compl. ¶ 75).  This discrepancy— two days—is immaterial for the purposes of the Court's present analysis.

the border and met with a Saudi on the other side while McAlister waited in the car.  *Id.*

McAlister was eventually escorted across the border and taken to a hospital in Saudi Arabia (to

make sure nothing had been "implanted in" him), and he was later released to "diplomatic

security and the FBI."  *Id.* at 88–89 (McAlister).

McAlister was never told the details of the negotiations leading to his release.  He was

told by the Chief Executive Office ("CEO") of AC4S that he was released in exchange for

monetary and other consideration.  *Id.* at 89 (McAlister).  Another detainee heard the Houthi

guards who detained McAlister and Hamen bragging to other prisoners that they were detaining

two Americans, and that they would get "something in exchange, as they had done before."  Dkt.

46-1 at 41–42, 44 (Al-Junaid Dep.).

### D.     Death of John Hamen

On or about November 6, 2015, John Hamen was strangled to death using a ligature.

Dkt. 48 at 119–126 (Arden).  This conclusion is supported by the positioning of the ligature mark

on Hamen's neck, the pinpoint hemorrhages on the surface of his eyes or inside his eyelids, and

the positioning of his tongue and teeth.  *Id.* at 114–23 (Arden).  In particular, the ligature mark

was below Hamen's Adam's apple and angled slightly upward at the back of his head, *id.* at

117–18 (Arden), which is consistent with a cause of death of strangulation, not suicide, *id.* at

121–23 (Arden).  In addition, the size of the mark indicates that something narrow, like rope,

was used to strangle Hamen.  Had Hamen sought to commit suicide, he likely would have only

had access to wider objects such as bedsheets, towels, or clothing.  *Id.* at 123–24 (Arden).

Hamen's body also had other injuries, including lacerations on the front and back of his

skull that indicate he was subjected to blows from a blunt object, *id.* at 128–32 (Arden); four

broken ribs consistent with crushing blows such as being stomped on or slammed against a wall

or the floor, *id.* at 132–34 (Arden); and contusions and abrasions on his face, back, chest, abdomen, shoulder, elbow, and shins, *id.* at 134–138, 141 (Arden). It is unclear, however, whether many of these wounds were inflicted at the time of death—for example, if Hamen was being forcibly held down during strangulation—or whether the wounds were inflicted before death. *Id.* at 139–41 (Arden). In any event, based on the testimony, the Court concludes that Hamen was deliberately killed by his captors by strangulation by ligature. His death was intended and was not the result of an accident or unrelated struggle.

Hamen was identified by his tattoos in a hospital in Sana'a and his body was returned to the United States. Dkt. 49 at 218–19 (Jennifer Hamen).

### III. CONCLUSIONS OF LAW

Under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604, a foreign state, including its instrumentalities, is immune from suit in state or federal court unless the case falls within an express statutory exception. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004). For present purposes, the sole relevant exception is found in the "state-sponsored terrorism exception," 28 U.S.C. § 1605A, which both confers subject-matter jurisdiction to hear certain terrorism-related claims under state or federal law and recognizes a federal cause of action against those foreign states subject to the exception, *see Owens*, 864 F.3d at 764–65. The FSIA also addresses personal jurisdiction and specifies precise procedures that a plaintiff must follow—at times with the assistance of the Clerk of the Court and the U.S. Department of State—to effect service on a foreign state. 28 U.S.C. § 1608.

For different reasons, the Court must satisfy itself that an FSIA plaintiff has cleared each of these hurdles, even if the defendant fails to appear. First, because the FSIA deprives courts of subject-matter jurisdiction in the absence of a relevant exception, a failure to appear does not

waive the defense, and the courts are "obligated to consider *sua sponte*" whether they have jurisdiction to hear the case and to order any relief. *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012); *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 n.20 (1983) (even where a defendant foreign state does not appear, the Court "still must determine that immunity is unavailable"). Second, with respect to the substance of the plaintiff's state or federal law claims, the FSIA precludes courts from entering a default judgment against a foreign state unless satisfied that the plaintiff has established her right to relief. 28 U.S.C. § 1608(e); *see also Owens*, 864 F.3d at 784–86. And, because "the entry of a default judgment is not automatic," courts must "satisfy [themselves] that [they have] personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6.

Each of these inquiries implicates a slightly different standard of proof. To establish subject-matter jurisdiction, an FSIA "plaintiff bears [the] initial burden of production to show an exception to immunity, such as § 1605A, applies," but, if the plaintiff does so, and the defendant does not appear, "jurisdiction attaches." *Owens*, 864 F.3d at 784. Having cleared this initial hurdle, however, "the plaintiff must still prove [her] case on the merits." *Id.* To do so, the plaintiff must "establish" her right to relief, which does not "relieve[] the sovereign of the duty to defend" but, nonetheless, requires that the plaintiff offer admissible evidence sufficient to substantiate the essential elements of her claim. *Id.* at 785–86 (quotations omitted). Finally, to establish personal jurisdiction over a defaulting defendant, the plaintiff must make "a prima facie showing of [personal] jurisdiction." *Mwani*, 417 F.3d at 6–7.

## A.     Subject-Matter Jurisdiction and Liability for § 1605A(c) Claims

"[T]he [federal] district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" asserting "any claim for relief in personam with respect to which

the foreign state is not entitled to immunity under" the FSIA.  28 U.S.C. § 1330(a).  The Court,

accordingly, has subject-matter jurisdiction over the present "nonjury civil action" against Iran if,

and only if, the conditions for the waiver of immunity found in 28 U.S.C. § 1605A are satisfied.

As explained below, Plaintiffs have carried their burden of establishing the Court's subject-

matter jurisdiction.

Under the state-sponsored terrorism exception, 28 U.S.C. § 1605A(a)(1), a foreign state

is not immune from the jurisdiction of the federal and state courts in cases in which

> [1] money damages are sought against a foreign state [2] for personal injury or
> death [3] that was caused by [4] an act of torture, extrajudicial killing, aircraft
> sabotage, hostage taking, or the provision of material support or resources for
> such an act if such act or provision of material support or resources is [5]
> engaged in by an official, employee, or agent of such foreign state while acting
> within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).  The exception, moreover, applies only to suits in which two

requirements are met.  First, the claimant or victim must be a U.S. national, a member of the U.S.

armed forces, or a U.S. government employee or contractor at the time the act of terrorism

occurred.  *Id.* at § 1605A(a)(2).  Second, the foreign state must be designated as a state sponsor

of terrorism both at the time the act occurred (or was so designated as a result of the act) and at

the time the lawsuit was filed (or was so designated within the six-month period preceding the

filing of the suit).[5]  *Id.*; *see also Owens*, 864 F.3d at 763.

---

[5]  Section 1605A(a)(2) also requires that the foreign state have received "a reasonable
opportunity to arbitrate the claim," but only if the act of terrorism "occurred in the foreign state
against which the claim has been brought."  28 U.S.C. § 1605A(a)(2)(A)(iii).  That requirement
is inapplicable to the facts of this case because none of the alleged acts of terrorism occurred in
Iran.

Most of the conditions for subject-matter jurisdiction are easily addressed. First, Plaintiffs seek only monetary relief and attorneys' fees. *See* Dkt. 29 at 20–21 (Am. Compl. Prayer). Second, although the claims brought by the estate of John Hamen differs in certain respects from those brought by the family members, all of the claims seek to recover "for personal injury" or "death." 28 U.S.C. § 1605A(a)(1). Third, Iran was designated as a state sponsor of terrorism in 1984, *see* 49 Fed. Reg. 2836–02 (Jan. 23, 1984) (statement of Secretary of State George P. Shultz), and has remained designated as a state sponsor of terrorism to this day, *see* U.S. Dep't of State, *State Sponsors of Terrorism*, available at https://www.state.gov/j/ct/list/c14151.htm (last visited August 7, 2019). This long-standing designation of Iran as a state-sponsor of terrorism is sufficient to satisfy the designation requirement. *See* 28 U.S.C. § 1605A(a)(2)(A)(i)(I). Fourth, at the time the relevant acts occurred, McAlister and Hamen were both U.S. nationals.

As a result, the only substantial jurisdictional question left for the Court is whether McAlister's injuries and Hamen's injuries and death were "caused by . . . act[s] of torture, extrajudicial killing, . . . hostage taking, or the provision of material support or resources for such an act" by an "official, employee, or agent of" Iran. 28 U.S.C. § 1605A(a)(1). For the reasons explained below, the Court concludes as follows: (1) the Houthis committed acts of "hostage taking" within the meaning of the International Convention Against the Taking of Hostages and "extrajudicial killing" within the meaning of the Torture Victim Protection Act; (2) Iranian officials or their agents provided "material support or resources" for these acts within the meaning of 18 U.S.C. § 2339A; and (3) Iran's provision of material support caused McAlister and Hamen's injuries and Hamen's death, as well as the associated injuries suffered by their

family members.  Plaintiffs, accordingly, have established that their claims fall within the state-sponsored terrorism exception of 28 U.S.C. § 1605A(a)(1).

1.      *The Houthis' Acts of Hostage Taking and Extrajudicial Killing*

The state-sponsored terrorism exception to the FSIA defines the terms "hostage taking," "torture," and "extrajudicial killing" by reference to the Convention Against the Taking of Hostages, 1316 U.N.T.S. 205, and the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, respectively.  *See* 28 U.S.C. § 1605A(h)(2) & (7).  To support a finding of subject-matter jurisdiction, the Court need only find that one of the three statutory acts were present as to each of the victims.  Dkt. 50 at 5–7.  *See* 28 U.S.C. § 1605A(a)(1); *see also Cronin v. Islamic Republic of Iran,* 238 F. Supp. 2d 222, 233–34 (D.D.C. 2002) (concluding that "[e]ither" finding of hostage-taking or torture "would support a finding of liability"), *abrogated on other grounds by Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004).  As discussed below, the Court concludes that Hamen was the victim of extrajudicial killing within the meaning of the TVPA and that McAlister was the victim of hostage taking within the meaning of the Convention Against the Taking of Hostages.  As a result, the Court need not reach the questions whether Hamen was also the victim of torture or hostage taking, or whether McAlister was also the victim of torture.

a.      <u>The Extrajudicial Killing of John Hamen</u>

The state-sponsored terrorism exception to the FSIA looks to the TVPA to define "extrajudicial killing."  28 U.S.C. § 1605A(h)(7).  Under the TVPA, "extrajudicial killing" means

> *a deliberated killing not authorized by a previous judgment* pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does

> not include any such killing that, under international law, is lawfully carried
> out under the authority of a foreign nation.

TVPA, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (emphasis added). As the D.C. Circuit has explained, this definition "contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 770. Applying this test, the Court concludes that Hamen was the victim of an extrajudicial killing.

First, Hamen was killed by the Houthis during his captivity. As discussed, the size and positioning of the ligature mark on Hamen's neck, the pinpoint hemorrhages on the surface of his eyes or inside his eyelids, and the positioning of his tongue and teeth, are all consistent with homicide, not suicide. Dkt. 48 at 114–23 (Arden). In addition, other circumstances of Hamen's death—in particular, his other injuries and the fact that he was looking for opportunities to escape—all support the conclusion that Hamen was brutally murdered and did not end his own life.

Second, Hamen's killing "[c]learly [was] not authorized by a prior judgment affording judicial guarantees o[f] due process." *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 202 (D.D.C. 2017); *see Owens*, 864 F.3d at 770. Nor was it "lawfully carried out under the authority of a foreign nation." TVPA, § 3(a). Unlike the definition of "summary executions" under Common Article 3 of the Geneva Conventions, 6 U.N.T.S. 3113, 75 U.S.T.S. 85, moreover, the state-sponsored terrorism exception to the FSIA does not require participation of a state actor; it is sufficient that a state actor provided material support for an extrajudicial killing committed by a nonstate actor. *Owens*, 864 F.3d at 770–78. The nonstate actor, however, must have acted "deliberately." *Han Kim*, 774 F.3d at 1050–51.

"A 'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse." *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 263 (D.D.C. 2016) (citing Webster's Third New International Dictionary 596 (1993); 4 The Oxford English Dictionary 414 (2d ed. 1989); Black's Law Dictionary 492 (9th ed. 2009)), *aff'd*, 864 F.3d 751.  The evidence offered by Plaintiffs satisfies this requirement.  The autopsy report shows that Hamen was either brutally beaten before he was strangled—thereby causing his fractured ribs and extensive bruising—or that he sustained these injuries as a result of being held down as he was strangled.  *See* Dkt. 48 at 123, 132–41 (Arden).  Either scenario indicates that Hamen's captors deliberately and viciously harmed him prior to his death.  Depending on how pressure was applied, moreover, the strangulation could have gone on for "a minute or so," *id.* at 127–28 (Arden), allowing Hamen's captors ample opportunity to spare his life had they intended to do so.  All of these facts support the conclusion that Hamen was deliberately strangled by his captors and that they made the calculated decision to end his life.  The fact that Hamen's captors may have, at some point, planned to keep him alive so that they could bargain for his release does not undercut the fact that they eventually decided to put him to death.  *See Fritz*, 320 F. Supp. 3d at 70, 83–84 (finding that the murder of U.S. soldiers constituted extrajudicial killings even though they were originally "abducted to be used in an effort to compel . . . [the] release [of] detainees").

The Court, accordingly, concludes that Hamen was a victim of an extrajudicial killing within the meaning of the TVPA.

> b.  The Hostage Taking of Mark McAlister

The FSIA's definition of "hostage taking" is borrowed from Article 1 of the International Convention Against the Taking of Hostages.  28 U.S.C. § 1605A(h).  Under that treaty, "hostage taking" means

> *seiz[ing] or detain[ing]* and *threaten[ing] to kill, to injure or to continue to detain another person* . . . in order *to compel a third party*, namely, a State, an international governmental organization, a natural or juridical person, or a group of persons, *to do or abstain from doing any act* as an *explicit or implicit condition* for the release of the hostage . . . .

International Convention Against the Taking of Hostages, art. 1, Dec. 17, 1979, 1316 U.N.T.S. 205 (emphases added). Thus, to show that the hostage taker had the requisite purpose of detaining the individual, "the plaintiff must 'suggest[ ][a] demand for *quid pro quo* terms between . . . [the hostage-taker] and a third party whereby [the hostages] would have been released." *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 360 (D.C. Cir. 2006) (first and second alterations in original).

The Court concludes that the Houthis committed an act of "hostage taking" when they seized and detained Mark McAlister. There is sufficient evidence indicating that the Houthis abducted McAlister "in order to compel a third party" to make an exchange or payment as a condition of McAlister's release. First, McAlister and Hamen were specifically targeted as hostages at the Sana'a airport because they were American: They were initially singled out when a Houthi guard saw their American passports and confirmed that they were American, and a British national was permitted to leave the airport whereas McAlister and Hamen were not. Dkt. 48 at 60–61 (McAlister). The Houthi guards at the detention facility bragged to other prisoners that they were detaining two Americans and that they would get "something in exchange [for them], as they had done before." Dkt. 46-1 at 41–42, 44 (Al-Junaid Dep.). During McAlister's detention, the State Department was concerned about making his continued detention public because it would have increased his value to the Houthis. *See* Dkt. 49 at 149 (Crystal McAlister). Right before his release, McAlister witnessed an individual making a series of telephone calls, and his captors told him that the calls were to negotiate his release. *Id.* at 87 (McAlister). The CEO of AC4S also later told McAlister that he was released in exchange for

monetary and other consideration. *Id.* at 89 (McAlister). Hostage-taking for ransom is also consistent with Houthi tactics, Dkt. 49 at 104 (Green); four other Americans had been abducted by the Houthis within the year prior to McAlister and Hamen's abductions, Dkt. 51-1 at 1 (Supp. Green Aff. ¶¶ 1–4); and other Americans in Yemen have only been permitted to leave the country after the payment of a ransom, Dkt. 48 at 157–60 (Sealed Witness).

Based on this evidence, the Court concludes that the Houthis committed "hostage taking" within the meaning of the International Convention Against the Taking of Hostages with respect to McAlister. Although the evidence also indicates that the Houthis likely committed acts of hostage taking with respect to Hamen as well, the Court need not reach this issue, as the Court's finding that the Houthis committed an extrajudicial killing of Hamen is sufficient to support liability.

2.    *Iran's Provision of Material Support for the Houthis' Acts of Hostage Taking and Extrajudicial Killing*

The Court further concludes that Iran provided the Houthis with material support for the acts described above. The FSIA's definition of "material support or resources" is borrowed from 18 U.S.C. § 2339A, which defines "material support or resources" in relevant part as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). The evidence set forth above demonstrates that Iran provided "material support or resources" to the Houthi militants in the form of weapons, financial support, and training, both directly and indirectly through Hezbollah. *See generally supra* Part II.A.3. Plaintiffs have presented a litany of evidence that Iran has provided the Houthis with weaponry since at least 2009. Dkt. 49 at 63-66 (Green); *id.* at 10–14 (Pregent). Plaintiffs also presented

evidence that Iran has provided financial assistance to the Houthis through Hezbollah. Dkt. 48 at 187–91 (Pregent); Ex. 11 at 1. And, finally, Iran has assigned a Qods Force officer as the leader of its efforts to "advise, assist, resource, and train the Houthis," Dkt. 32-4 at 8 (Green Aff. ¶ 32); Dkt. 49 at 53, 64, 96 (Green), and has facilitated the Houthis' training with Hezbollah's Unit 3800 in Yemen, Lebanon, Syria, and Iraq, Dkt. 49 at 96 (Green); Dkt. 48 at 191 (Pregent).

Plaintiffs have offered evidence that, without Iranian financial, military, and political support, the Houthis would not have been able to exert power or control outside of their home province of Saada; would not have been able to seize or maintain control of the capital city of Sana'a; and would not have developed the tactic of taking foreign nationals hostage. Dkt. 49 at 112 (Green); *id.* at 20–22 (Pregent). Even more to the point, Plaintiffs have offered evidence that, without Iran's backing, the Houthis would not have attempted to kidnap an American, nor would they have been able to do so without Iran's support. *Id.* at 16–17 (Pregent); *id.* at 69 (Green).

3. *Causation*

The only remaining requirement for finding a waiver of sovereign immunity under § 1605A is a showing that the injuries and deaths at issue were "caused by" Iran's provision of material support to the Houthis. 28 U.S.C. § 1605A(a)(1). The D.C. Circuit has held that this statutory language, like the similar language that previously appeared in 28 U.S.C. § 1605(a)(7) (repealed), "requires a causal connection" as a jurisdictional prerequisite to suit. *Kilburn*, 376 F.3d at 1127; *see also Owens*, 864 F.3d at 794–99. The Court of Appeals has rejected the contention that the plaintiff need establish "but for" causation, however, and has held that the statute "require[s] only a showing of 'proximate cause.'" *Kilburn*, 376 F.3d at 1128; *see also Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 273 (D.C. Cir. 2018) (explaining that the Anti-

Terrorism Act's "'by reason of' language demands a showing of proximate causation."). An FSIA plaintiff, accordingly, need not show that the defendant state "specifically knew of or intended its support to cause" a particular terrorist act. *Owens*, 864 F.3d at 798.

Under long-established law, proximate cause requires "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Kilburn*, 376 F.3d at 1128 (quoting Prosser & Keeton on the Law of Torts 263 (5th ed. 1984)); *see also Owens*, 864 F.3d at 794 (quoting same). The proximate cause inquiry "contains two similar but distinct elements." *Kilburn*, 376 F.3d at 1128. First, Plaintiffs must show that Iran's provision of support to the Houthis was "a 'substantial factor' in the sequence of events that led to the" hostage taking of McAlister and the extrajudicial killing Hamen. *Id.* (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)). Second, Plaintiffs must establish that McAllister's kidnapping and Hamen's death were "'reasonably foreseeable or anticipated as a natural consequence' of [Iran's] conduct." *Id.* (quoting *Rothstein*, 708 F.3d at 91).

The Court concludes that there is sufficient evidence in the record to satisfy this standard. The support Iran provided the Houthis was not only a "substantial factor" but a necessary precondition to the Houthis kidnapping of McAlister and Hamen. Without Iran's support, the Houthis would not have had control of the Sana'a airport in October 2015. *See* Dkt. 49 at 53–54, 112 (Green); *id.* at 20–22 (Pregent). Prior to Iran's support, the Houthis were "localized" to their home province, Dkt. 49 at 44 (Green), and would not have had the resources to seize Sana'a, *id.* at 53–54 (Green). Iran's support put the Houthis in a position of power to commit acts of terrorism like the ones at issue in this case.

Beyond increasing the Houthis' influence in Yemen, Iran also provided the training and political backing necessary to enable and to embolden the Houthis to target and to kidnap

Americans and to negotiate for their release. Plaintiffs have provided evidence that the Qods Force, either directly or through Hezbollah, "exports" to its proxies a "collection of behaviors[,] tactics, and capabilities," *id.* at 111 (Green), which includes training in "assassination and kidnapping training," Dkt. 48 at 182–83 (Pregent), and, in particular, the "taking of international hostages," Dkt. 49 at 107 (Green). There is also evidence that the Houthis have adopted the full range of those tactics, *see id.* at 96–107 (Green), including abducting 982 people for ransom and engaging in 796 documented cases of torture between September 2014 and August 2015, *id.* at 101 (Green); Ex. 39 at 4–5, 16. Plaintiffs have presented evidence that, beginning in 2015, the Houthis began kidnapping Americans, in particular, and holding them for ransom, Dkt. 51-1 at 1 (Green Supp. Aff. ¶¶ 1–4) (attesting that there have been four previous Houthi kidnappings of U.S. citizens); Dkt. 49 at 108 (Green), after the maturation of Iranian military and political backing, Dkt. 49 at 112–13 (Green). Plaintiffs' experts convincingly opined that the abduction of McAlister and Hamen were "consistent" with Iranian tactics. Dkt. 49 at 110–11 (Green); Dkt. 49 at 16 (Pregent).

In addition to training, Iran has provided the political backing and tactical support necessary for the Houthis to execute a high-stakes abduction of Americans. Plaintiffs presented evidence that, due to the risk and complexity of kidnapping Americans and bargaining for their release, the Houthis would not have attempted to do so without the support of Iran, Dkt. 49 at 69 (Green); *id.* at 16–17, 21–22 (Pregent), and that Iran would have been made aware of any hostage-taking the Houthis carried out, *id.* at 21–22 (Pregent). Even more to the point, Plaintiffs have presented evidence that the Qods Force encourages its proxies to kidnap Americans by providing "kidnapping incentives" in the form of a "bounty or reward for . . . high value targets." Dkt. 48 at 191–92 (Pregent); Dkt. 49 at 22 (Pregent). And, from Iran's perspective, the "highest

value target [a proxy] can kidnap would be an American." Dkt. 48 at 192 (Pregent). With respect to the hostage taking of Mark McAlister, the fact that the Houthi negotiator would "make a phone call, he'd wait, then he'd answer the phone, then he'd make another phone call," Dkt. 50 at 24 (Closing Statement); *see also* Dkt. 48 at 101 (McAlister), together with the expert testimony that the Qods Force provided training to the Houthis on international hostage taking, and that the Houthis would not have proceeded without Iranian approval, evinces a likelihood that the negotiator was conferring with an Iranian or Hezzbollah contact to strategize about or to seek approval for the terms of McAlister's release. And with respect to the extrajudicial killing of John Hamen, Iranian assistance in kidnapping Americans was a "substantial factor" in the sequence of events leading to Hamen's death. *See* Dkt. 50 at 17 (Closing Statement).

Accordingly, the Court concludes that Iran's support was a "substantial factor" in the hostage-taking of Mark McAlister and the extrajudicial killing of John Hamen.

For similar reasons, the hostage-taking of McAlister and murder of Hamen were "'reasonably foreseeable or anticipated as a natural consequence' of [Iran's] material support." *Owens*, 864 F.3d at 798 (quoting *Rothstein*, 708 F.3d at 91). In assessing reasonable foreseeability, the Court must consider "the broader context" of Iran's conduct. *Id.* In this respect, it is clear that Iran's assistance made it possible for the Houthis—a militant group that chants "Death to America" and has a history of kidnapping local dissenters and holding them for ransom—to become a regional power and to assume a position of control where it could execute abductions and killings of U.S. citizens. In the years preceding the abductions of McAlister and Hamen, moreover, Iran provided training (either directly or through Hezbollah), which included "assassination and kidnapping training," Dkt. 48 at 182–83 (Pregent), and, in particular, the "taking of international hostages," Dkt. 49 at 107 (Green). Iran also encourages their proxies to

kidnap Americans.  Dkt. 48 at 191–92 (Pregent); Dkt. 49 at 22 (Pregent).  That one of Iran's

proxies acted to abduct and detain Americans is not only a "reasonably foreseeable" "natural

consequence," *Owens*, 864 F.3d at 798, but a desired result of Iran's training and directives.

That one of the Americans was also brutally killed was, "by any reasonable measure, a

foreseeable consequence of Iran's support."  *See Fritz*, 320 F. Supp. at 86.  Finally, although

specific intent is not required to establish causation, *Owens*, 864 F.3d at 798, Plaintiffs have

submitted evidence that, even if Iran had not been involved at "the hour of the kidnapping," it

would have been notified once McAlister and Hamen were in the Houthis custody and the

Houthis could not have "h[e]ld Americans without the IRGC-Qods Force allowing it" to do so.

Dkt. 49 at 20–22 (Pregent); *see also id.* at 69 (Green).

     Having determined that Iran provided material support for the Houthis and that this

support "caused" the hostage-taking of McAlister and extrajudicial killing of Hamen, the Court

finds that this case falls squarely within the state-sponsored terrorism exception to the FSIA.[6]

*See* 28 U.S.C. § 1605A(a)(1).  As a result, the Islamic Republic of Iran is not entitled to foreign

sovereign immunity, and the Court possesses subject-matter jurisdiction over Plaintiffs' claims.

*See* 28 U.S.C. §§ 1330(a), 1605A(a)(1).

     4.    *Federal Cause of Action*

     Having concluded that the Court possesses subject-matter jurisdiction, little else is

required to show that Plaintiffs are entitled to relief under the federal cause of action the

Congress enacted in 2008 as part of the National Defense Authorization Act. *See* Pub. L. No.

---

[6]  The fact that most of the Plaintiffs in this case are "third-party claimant[s]" rather than "the
legal representative[s] of [the] victim[s] [who were] physically injured" does not divest this
Court of subject-matter jurisdiction.  *Owens*, 864 F.3d at 807.  "Who in particular may bring a
claim against a foreign sovereign is a question of substantive law, wholly separate from the
question of [federal courts'] jurisdiction." *Id.*

110-181, § 1083, 122 Stat. 338–44 (2008) (codified at 28 U.S.C. § 1605A(c)).  There is almost total "overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity," *Foley*, 249 F. Supp. at 205, and a plaintiff who offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law—with one minor exception.  For the "personal injury or death caused by" any of the acts described in the state-sponsor of terror waiver of foreign sovereign immunity and over "which the courts of the United States may maintain jurisdiction under [§ 1605A] for money damages,"  28 U.S.C. § 1605A(c), a foreign state designated as a sponsor of terrorism is only liable to "a national of the United States," "a member of the armed forces," "an employee [or contractor] of the [U.S.] Government . . . acting within the scope of the employee's employment," or "the legal representative of " any such person.  *Id.*  Because all the Plaintiffs are U.S. nationals or representatives of U.S. nationals, Plaintiffs have, for the reasons described above, carried their burden on demonstrating that they are entitled to relief under § 1605A(c).

## B.    Personal Jurisdiction

The Court also concludes that it has personal jurisdiction over the Islamic Republic of Iran.  Under the FSIA, the Court has personal jurisdiction over a foreign state "as to every claim for relief over which the [Court] ha[s] jurisdiction . . . where service has been made under section 1608."  28 U.S.C. § 1330(b).  Thus, "[i]n order to sue a foreign state or one of its political subdivisions, a plaintiff must effect service in compliance with" 28 U.S.C. § 1608(a).  *Barot v. Embassy of the Republic of Zam.*, 785 F.3d 26, 27 (D.C. Cir. 2015).

Section 1608(a) sets forth four methods of service in descending order of preference:

(1)     by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

(2)     if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

(3)     if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned; or

(4)     if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services— and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).

The first two mechanisms of effecting service—by delivery of the summons and complaint either "in accordance with any special arrangement for service between the plaintiff and the foreign state" under § 1608(a)(1) or "in accordance with an applicable international convention on service of judicial documents" under § 1608(a)(2)—were not available to Plaintiffs in this case. No "special arrangement" governs service between Plaintiffs and Iran, and "Iran is not party to an 'international convention on service of judicial documents,'" *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008) (internal citations omitted).

As a result, Plaintiffs attempted service under the third alternative, which requires service by mail from the Clerk of the Court to the head of the ministry of foreign affairs of the foreign state. 28 U.S.C. § 1608(a)(3). On June 21, 2017, Plaintiffs initiated service to Iran under

§ 1608(a)(3). Dkt. 20. The Clerk of Court mailed the relevant documents to Iran on June 26, 2017. Dkt. 21. Plaintiffs notified the Court that the mailing was returned as undeliverable. Dkt. 24 at 2.

Finally, Plaintiffs served Defendants under § 1608(a)(4). Dkt. 23. That provision requires service by mail from the Clerk of Court to the Secretary of State, who must then transmit the required material through diplomatic channels to the foreign state. 28 U.S.C. § 1608(a)(4). The Department of State must then send "the Clerk of the Court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.* Plaintiffs provided the Clerk with the relevant documents and requested service pursuant to § 1608(a)(4) on July 27, 2017. Dkt. 22. The Clerk mailed these materials to the State Department on August 8, 2017. Dkt. 23. On January 26, 2018, the State Department notified the Clerk that the documents had been delivered to the Islamic Republic of Iran. Dkt. 25. As the Department explained, "[b]ecause the United States does not maintain diplomatic relations with the government of Iran," the documents were transmitted to the Embassy of Switzerland in Iran, which then transmitted the materials to the Iranian Ministry of Foreign Affairs on December 27, 2017. *Id.* at 1, 4. The Swiss Embassy reported that the Iranian Ministry of Foreign Affairs "refused" to accept the documents that same day. *Id.* at 4. After the Islamic Republic of Iran failed to respond, the Clerk entered a default. Dkt. 27.

Plaintiffs efforts to serve Iran satisfied the requirements of § 1608(a)(4). Because Plaintiffs accomplished service under 28 U.S.C. § 1608(a)(4) on the Islamic Republic of Iran, the Court possesses personal jurisdiction over Defendant. *See* 28 U.S.C. § 1330(b).

Accordingly, Plaintiffs have established their right to relief under 28 U.S.C. § 1605A(c).[7]

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for default judgment, Dkt. 31, will be **GRANTED**. A separate order will issue. The Court will also enter a separate order appointing a special master to hear Plaintiffs' damage claims and to report to the Court regarding the appropriate award.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: August 7, 2019

---

[7] Plaintiffs assert state law claims for the wrongful death of Hamen. *See* Dkt. 29 at 18–19 (Amd. Compl. ¶¶ 115–21). In light of the Court's finding of liability under the FSIA, and because these claims are redundant of their federal law claims and do not provide any additional right to recover, the Court declines to reach them.